IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| JOHN B. ADRAIN, | § | |
| | § | |
| *Plaintiff*, | § | Case No. 2:10-cv-173 |
| | § | |
| vs. | § | **JURY TRIAL DEMANDED** |
| | § | |
| VIGILANT VIDEO, INC. and THE CITY OF | § | |
| PORT ARTHUR, TEXAS, | § | |
| | § | |
| *Defendants*. | § | |

**PLAINTIFF JOHN B. ADRAIN'S OPENING CLAIM CONSTRUCTION BRIEF**

.

John T. Polasek
C. Dale Quisenberry
Jeffrey S. David
S. Calvin Capshaw
Elizabeth L. DeRieux

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................................1

II.   BACKGROUND OF THE '669 PATENT ........................................................2

III.  CLAIM CONSTRUCTION PRINCIPLES ......................................................3

IV.   CLAIM CONSTRUCTION ANALYSIS ........................................................5

    A.   Agreed-to Terms ....................................................................................6

        1.   Programmer....................................................................................6

        2.   Analysis Criteria ...........................................................................6

        3.   Cooperate .......................................................................................6

        4.   Utilization Criteria ........................................................................6

    B.   Claim 1 Of The '669 Patent ...................................................................6

        1.   Movably Mounted Camera ............................................................7

        2.   Space to be Monitored ...................................................................9

        3.   Interpreter......................................................................................10

        4.   Image Data .....................................................................................11

        5.   Reference Memory..........................................................................12

        6.   Reference Image Data ....................................................................14

        7.   Comparing Image Data ..................................................................15

        8.   Image Data from the Reference Memory.....................................16

        9.   Image Data Comparisons ..............................................................17

        10.  Comparator ....................................................................................18

        11.  Comparison Criteria.......................................................................20

i

12.   Image Portions ............................................................................21

13.   Monitoring System.......................................................................21

14.   Output Interface ..........................................................................23

C.   Claim 8 Of The '669 Patent – The Record Memory ............................................24

IV.   CONCLUSION ...........................................................................................26

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Athletic Alternatives, Inc. v. Prince Mfg., Inc.*,

    73 F.3d 1573 (Fed. Cir. 1996)........................................................................... 5

*Bose Corp. v. JBL, Inc.*,

    274 F.3d 1354 (Fed. Cir. 2001)......................................................................... 25

*Brown v. 3M*,

    265 F.3d 1349 (Fed. Cir. 2001)......................................................................... 22

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,

    388 F.3d 858 (Fed. Cir. 2004)............................................................................. 5

*Chimie v. PPG Indus., Inc.*,

    402 F.3d 1371 (Fed. Cir. 2005)........................................................................... 5

*E.I. Dupont de Nemours & Co. v. Phillips Petroleum, Co.*,

    849 F.2d 1430 (Fed. Cir. 1988)........................................................................... 4

*In re Moore*,

    439 F.2d 1232 (CCPA 1971) ............................................................................ 26

*In re Paulsen*,

    30 F.3d 1475 (Fed. Cir. 1994)........................................................................... 23

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*,

    381 F.3d 1111 (Fed. Cir. 2004)........................................................................... 3

*Inverness Med. Switz. GmbH v. Warner Lambert Co.*,

    309 F.3d 1373 (Fed. Cir. 2002)........................................................................... 5

*Markman v. Westview Instruments, Inc.*,

    52 F.3d 967 (Fed. Cir. 1995) ........................................................................................... 3, 4, 5

*Nazomi Communic'ns, Inc. v. ARM Holdings, PLC*,

    403 F.3d 1364 (Fed. Cir. 2005) ............................................................................................ 4

*Philips v. AWH Corporation*,

    415 F.3d 1303 (Fed. Cir. 2005) ................................................................................... passim

*Rowe v. Dror*,

    112 F.3d 473 (Fed. Cir. 1997) ............................................................................................ 23

*Sandisk Corp. v. Memorex Prods.*,

    415 F.3d 1278 (Fed. Cir. 2005) ........................................................................... 12, 15, 20

*Trontech Licensing, Inc. v. Thomson, Inc.*,

    2008 U.S. Dist. LEXIS 108966 (E.D.Tex. Jan. 2, 2008). ............................................. 3, 10

**Statutes**

35 U.S.C. § 112 ........................................................................................................................... 5

**Rules**

MPEP § 2173.05(e) .................................................................................................................... 27

## I.      INTRODUCTION

Adrain's patent – U.S. Patent No. 5,831,669 ("the '669 patent"), entitled "Facility Monitoring System with Image Memory and Correlation" and issued on November 3, 1998 (A001-007) – generally relates to a system for monitoring a space with a movably mounted camera, detecting images, extracting data from those images, and comparing the data to various types of data.[1] An application of the '669 patent is mobile license plate recognition (MLPR).  MLPR technology involves a movably mounted camera that can capture an image of a vehicle on a street, parking lot, or elsewhere, and determine whether the image contains a license plate.  If an image includes a license plate, data representative of the license plate number is extracted.  This data can be compared to databases of license plate numbers, such as a stolen vehicle registries or Amber Alert registries.  If the captured license plate data matches a database entry, the system can output an alert to the system's operator.  The MLPR system's operator can then take an appropriate action.

After learning of the infringement of his patent, Adrain brought suit in this Court against defendants Vigilant Video, Inc. ("Vigilant") and The City of Port Arthur, Texas ("Port Arthur;" collectively "Defendants") to protect and enforce his rights in the '669 patent.

The claim terms and phrases at issue in this case are not highly complex or technical.  Adrain and Defendants have narrowed the list of claim terms and phrases to be construed to fifteen terms and phrases.  These terms and phrases can readily be construed on the intrinsic record alone,

---

1       All references herein are to "A____" are to the pages numbers of the Appendix submitted herewith, which includes the '669 patent, the '669 patent's file history, and Adrain's extrinsic evidence.

although applicable dictionary definitions – when read in context of the claims and specification – confirm and support these constructions.[2]

## II.      BACKGROUND OF THE '669 PATENT

John B. Adrain is an individual inventor, with several patents to his name.  He originally conceived of the invention described in the '669 patent after observing silicon wafer processing equipment in or around the summer of 1995.  The equipment Adrain observed had the capability of using cameras and computer systems to image "fiducials," or small marks, on the silicon wafers in order to properly align blades that would cut the wafers.  Thereafter, Adrain realized that the imaging technology he had observed could be significantly modified and improved upon.  Adrain devised a system using imaging technology in a mobile setting.  In one embodiment, Adrain further devised a system that could be used, such as by law enforcement officers, to observe and capture license plates on vehicles by positioning imaging cameras on moving vehicles, or other mobile mounts.  (A005-A006, 4:65-5:6).  Adrain also devised a system for determining motion or abnormalities in an area through the detection and comparison of multiple images.  In yet another embodiment, Adrain devised a system to be used in casinos to detect cheating, as well as in building security to follow and detect the movements of people within the building.

Adrain has enforced this patent against others, each of whom has licensed the technology. *See*, *e.g.*, *Adrain v. Genetec et al.*, case no. 2:08-cv-00423 in the Eastern District of Texas; *Adrain v.*

---

2       The '669 patent is currently undergoing an *ex parte* reexamination proceeding, brought by Defendants. Defendants contend that the prosecution history of the reexamination proceedings should be considered in the construction of the claims of the '669 patent.   Adrain disagrees; as no reissue certificate has issued yet in the reexamination proceedings and the claims may be further changed.  Adrain contends that the reexamination prosecution history yields little insight into the proper constructions of the terms and phrases herein.

*Tannery Creek Systems, et al.*, case no. 2:09-cv-326 in the Eastern District of Texas; *Adrain v. NDI Technologies, Inc., et al.*, case no. 6:10-cv-01059 in the Middle District of Florida.

## III.   CLAIM CONSTRUCTION PRINCIPLES

Claim construction is a legal question for the courts.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995).  The claims of a patent define what the patentee is entitled the right to exclude.  *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004).

The principles used in properly construing claims were outlined by the Federal Circuit in *Philips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005).  Claim terms are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art in question at the time of the filing of the patent.  *Id.* at 1313.  In determining the ordinary and customary meaning of a term, deference is given to the intrinsic evidence of a patent (*i.e.*, the patent and its file history). *Id.* at 1315.  The *Philips* court stated that the "specification, informed, as needed, by the prosecution history," is the "best source for understanding a technical term."  *Id.*  The claims themselves often provide substantial guidance as to the meaning of disputed terms.  *Id.* at 1314.  A person skilled in the art is "deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id.* at 1313.  The specification is "[u]sually…dispositive; it is the single best guide to the meaning of a disputed term."  *Id.* at 1315.  The "patentee may be his own lexographer," and provide special definitions for terms used in the patent.  *Trontech Licensing, Inc. v. Thomson, Inc.*, 2008 U.S. Dist. LEXIS 108966, *10 (E.D.Tex. Jan. 2, 2008).

The claims should not be interpreted by importing limitations from the specification into the claims. *Philips*, 415 F.3d at 1323; *see also E.I. Dupont de Nemours & Co. v. Phillips Petroleum, Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988). The Federal Circuit has made clear that using the specification to read limitations into the chosen claim language is a "cardinal sin" of claim construction. *Phillips*, 415 F.3d at 1320 ("[O]ne of the cardinal sins of patent law [is] reading a limitation from the written description into the claims.").

Although "the distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice," the line should be reasonably clear if the district court remains focused on how a person of ordinary skill in the art would understand the claim terms. *Id.* Reading the claims and specification in context will usually inform the court whether the patentee is merely setting out specific examples of embodiments or whether the patentee, instead, intends for the claims to cover only the described embodiments in the specification. *Id.* When the specification simply describes specific embodiments, the claims should not be confined to those embodiments. *Id.*; *see also Nazomi Communic'ns, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005) (claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification"). Accordingly, the written description contained in the specification does not limit the scope of the claims set forth in the patent. *Markman*, 52 F.3d at 980.

Courts may also consider the prosecution history in the construction of claims. *Philips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*; *see also Inverness*

*Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380-82 (Fed. Cir. 2002) (the ambiguity of the prosecution history made it less relevant to claim construction); *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (the ambiguity of the prosecution history made it "unhelpful as an interpretive resource" for claim construction).   One purpose of consulting the prosecution history in construing a claim is "to exclude any interpretation that was disclaimed during prosecution." *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005).

Courts are also authorized to consult extrinsic evidence to determine the meaning of a disputed claim term.  *Phillips*, 415 F.3d at 1317.  Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980.  Technical dictionaries, in particular, are important sources of extrinsic evidence, because they "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Philips*, 415 F.3d at 1317.  Extrinsic evidence can therefore be helpful in determining the meaning of claims.  *Id*.  Although extrinsic evidence may be helpful, the intrinsic record is more important in determining the meaning of claim terms.  *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004).

## IV.   CLAIM CONSTRUCTION ANALYSIS

Adrain has asserted 8 claims in the '669 patent:  claims 1-3 and 6-10.  Adrain has identified several claim terms and phrases for construction, as have Defendants.  Several of the disputed terms and phrases are common to many of the asserted claims, and will be discussed in detail only the first time the term/phrase appears in a claim.  Neither Adrain nor Defendants has identified any terms or phrases that fall under 35 U.S.C. § 112, Paragraph 6.  Accordingly, no terms or phrases in the '669 patent should be construed as means-plus-function limitations.

### A.     Agreed-to Terms

#### 1.     Programmer

The parties have agreed to a construction for the term "programmer," which appears in several claims of the '669 patent.  The parties agree that this term means:  "A microcomputer and/or associated software used to input criteria, such as comparison criteria, analysis criteria, and utilization criteria."

#### 2.     Analysis Criteria

The parties agree that the phrase "analysis criteria," which appears in several claims of the '669 patent, should be construed to mean "rules used by the interpreter for the selection of image data."

#### 3.     Cooperate

Adrain contends that no construction is necessary for this term.  However, if the Court concludes that a construction is necessary for this term, Adrain and Defendants agree that this term should be construed to mean "work together."

#### 4.     Utilization Criteria

The parties agree that the phrase "utilization criteria," which appears in several claims of the '669 patent, should be construed to mean "rules used by the comparator and/or output interface for reporting results of comparisons."

### B.     Claim 1 of the '669 Patent

Claim 1 of the '669 patent (A006) reads as follows, with the disputed terms and phrases bolded:

| 1 | A **monitoring system** comprising: |
|---|---|
| a. | A **movably mounted camera** adapted for receiving images of a **space to be monitored**; |
| b. | An **interpreter** for receiving **image data** from a camera; |
| c. | A **reference memory** for storing **reference image data**; |
| d. | A **comparator** connected for **comparing image data** from the **interpreter** to **image data from the reference memory** according to **selected comparison criteria**, wherein the interpreter and comparator cooperate to select recognizable portions of image data in the space being monitored, the selected **image portions** being compared to the image data in the reference memory; and |
| e. | An **output interface** for reporting results of the **image data comparisons** performed by the comparator. |

## 1.    Movably Mounted Camera

| **Adrain's Construction:**  A camera that is fastened or affixed to a support that can be moved from one place to another and that can monitor a space while it is moving or being moved.. |
|---|
| **Defendants' Construction:**  mounted to a movable support |

As discussed above, the '669 patent is directed to a system for monitoring an area using a camera that is capable of being affixed to a non-stationary support (see generally discussion at 4:60-5:15).  A particular application of the invention discussed in the '669 patent is MLPR – a technology that *requires* a camera that moves on a mobile support.  (A0005-A0006, 4:60-5:6).  Here, "movably mounted camera" should be construed with its plain meaning, which is supported by the intrinsic evidence, as well as by extrinsic evidence.  There can be no question that "mounted" has its common meaning of "fastened or affixed."  (MCGRAW HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS, p. 1377 (6th Ed. 2002) (A112).

"Movably" here, means the camera *and* the support move.  This is supported by Adrain's statement during prosecution of the '669 patent that the "present invention … specifically provides that the camera can move, for example, being mounted on a vehicle."  (A077, April 14, 1997

Response to Office Action, p.5).  The specification supports this construction, as well, noting that "the camera can be mounted on a police car."  (A0004, 4:63-64).  A police car – here, the "support"– is clearly something that moves.  Accordingly, "movably" means that the camera and the support move together.

Moreover, the '669 patent teaches a system in which the movably mounted camera operates while the camera is in motion, as indicated by Adrain's statements during the prosecution of the '669 patent.  For example, Adrain stated in a response to an office action:  "*As the space being monitored changes*, the interpreter selects certain parts of the image for comparison and disregards other parts of the image."  (A077, April 14, 1997 Response to Office Action, p.5) (emphasis added).  The phrase "as the space being monitored changes" relates to the fact that, per the specification, the "space and objects being monitored change according to the movement of the vehicle."  (A005, 5:61-63).  In other words, Adrain contemplated that the interpreter[3] would receive data from a camera while (or "as") the camera is in motion.

Based on the ordinary meaning of the phrase, as well as the intrinsic evidence, "movably mounted camera" should be construed to mean "a camera that is fastened or affixed to a support that can be moved from one place to another and that can monitor a space while it is moving or being moved."

The defendants also seek to construe "camera."  Adrain contends that this is a commonly-understood word and requires no construction.  The claims as issued clearly recite a camera.  The defendants attempt to incorporate additional limitations, such as a requirement that the camera be

---

[3]      The "interpreter" is defined below, at IV.B.3.

digital, from the file history of the pending reexamination.  This is improper.  The prosecution

history in the reexamination proceedings is still pending.  The Patent and Trademark Office may

withdraw its rejection, or require further changes to the claims pending in the reexamination.  More

importantly, the claims at issue are not the claims as modified in the reexamination proceeding - the

claims at issue are those that originally issued as the '669 patent.  Incorporating claim language from

the prosecution history of the reexamination proceeding is not appropriate at this stage.

Furthermore, the defendants' construction for "camera" is erroneous.  The defendants'

"construction" of  "camera" as "a digital camera that directly outputs digital image data" is not a

construction of "camera," but simply an attempt to include additional limitations into the claim

language of the '669 patent.  Using the specification to read limitations into the chosen claim

language is a "cardinal sin" of claim construction. *See, e.g., Phillips*, 415 F.3d at 1320.  Defendants'

construction cannot, therefore, be correct.  The term camera needs no construction.

### 2.      Space to be Monitored

| **Adrain's Construction:**  any area that is imaged by the movably mounted camera, which area can change according to movements of the movable support. |
|---|
| **Defendants' Construction:**  location being monitored |

Element (a) of Claim 1 recites that the movably mounted camera receives images of a "space

to be monitored."  Multiple examples for this phrase exist in the specification of the '669 patent that

illustrate the phrase's meaning.  The specification states that the "space" that is monitored can

include "roads" for the purpose of locating license plates. (A006, 5:33-35).  The "space" could also

be "a room, an entry, a passage, or *any other location*."  (A005, 3:15-16) (emphasis added).

As discussed above, the camera in the monitoring system of the '669 patent is affixed to a

support that moves.  The space monitored by this camera, should therefore be expected to change.

The '669 patent's specification supports such a definition, noting that the "space and objects being monitored change according to the movement of the vehicle."  (A005, 5:61-63).

Accordingly, "space to be monitored" should be construed to mean "any area that is imaged by the movably mounted camera, which area can change according to movements of the movable support."

### 3.    Interpreter

| |
|---|
| **Adrain's Construction:**   a microcomputer and/or associated software that selects data from a camera. |
| **Defendants' Construction:**  selects digital image data from the camera |

Claim 1 recites, in element (b), an "interpreter."  The context of the claim itself clearly indicates that the interpreter is a component of the system that receives data from the camera.  The specification further elaborates on the interpreter, noting that the interpreter "selects image data from the cameras."[4]  (A005, 3:28-29).  It is well-established that a patentee may define terms used in the claims in the specification as he sees fit.  *Trontech*, 2008 U.S. Dist. LEXIS 108966, *10.  Adrain stated in the specification that the interpreter is "integrated in a microcomputer and associated software." (A005, 3:49-52).  The specification therefore clearly identifies the proper construction for "interpreter."

Defendants' construction of the term "interpreter" is narrow and adds limitations that do not exist in the claims.  Specifically, the phrase "digital image" that Defendants seek to import into this claim element finds no support in the specification, the claims, or the file history that lead to the issuance of these claims.  It is improper to read additional limitations into the claim language.  Using

---

[4]      "Image Data" is defined below, in IV.B.4.  It should be noted here, however, that Adrain's definition of "image data" differs significantly from that of Vigilant.

the specification to read limitations into the chosen claim language is a "cardinal sin" of claim construction. *See, e.g., Phillips*, 415 F.3d at 1320.   Accordingly, Defendants' construction of "interpreter" cannot possibly be correct.

Accordingly, based on the unambiguous definition of "interpreter" that is present in the intrinsic evidence, "interpreter" should be construed to mean "A microcomputer and/or associated software that selects data from a camera."

### 4.   Image Data

| |
|---|
| **Adrain's Construction:**  data that is input to the interpreter, including data representative of a license plate number, or other types of data. |
| **Defendants' Construction:**  digital data related to an image taken from a camera |

Claim 1 of the '669 patent discloses the invention's capabilities of analyzing "image data" and comparing it to reference data.  The phrase "image data," as used in the '669 patent, has a broader meaning than that urged by the Defendants.  The monitoring system described by the '669 patent can be used in a number of applications beyond the license plate recognition context.  For example, some of these applications include thermal imaging or Micropower Impulse Radar for monitoring through opaque materials.  (A006, 6:10-18).  The '669 patent's specification states that "[d]ata other than visual images can be analyzed."  (A006, 6:10).  The '669 patent also states that image data can consist of license plate numbers:

> "For example, the camera can be mounted on a police car and programmed to monitor license plates *numbers*.  The reference memory stores license numbers for stolen cars.  Analysis is limited to consistently sized characters within a specified boundary, that is the rectangular shape of the license plate.  When the object meets the analysis criteria of a license plate, the *number* is compared to the numbers in the reference memory."

(A005-A006, 4:63-5:3) (emphasis added).   Accordingly, the '669 patent contemplates that the "image data" can be any type of data, even numbers representative of a license plate number.  *Id.*

Moreover, the '669 patent specifies that image data is data that is input into the interpreter. As noted above in III.B.3, the interpreter receives "image data" from the cameras in the system.  The cameras in the system are "connected to input image data to an interpreter," and the "interpreter selects image data from the cameras."  (A005, 3:28-30).  Image data is therefore data (of multiple types) that is input to the interpreter.

Defendants' proposed construction for this term, "digital data related to an image taken from a camera" is too narrow of a construction to be correct, and commits the "cardinal sin" of reading limitations into the chosen claim language. *See, e.g., Phillips*, 415 F.3d at 1320.  Defendants' construction ignores that that other types of data can be input into the interpreter, and makes little sense in the context of the claims.  As noted above, "[d]ata other than visual images can be analyzed. (A006, 6:10).  Defendants' construction would preclude the analysis of data other than visual images.  Defendants' construction would therefore exclude a preferred embodiment, and is therefore an incorrect construction.  A claim construction that excludes a preferred embodiment is rarely, if ever, correct. *Sandisk Corp. v. Memorex Prods*., 415 F.3d 1278, 1285 (Fed. Cir. 2005).

The phrase "image data" should be construed to mean "data that is input to the interpreter, including data representative of a license plate number, or other types of data."

### 5.    Reference Memory

| | |
|---|---|
| **Adrain's Construction:**  hardware for the storage and retrieval of data, which data may be used for comparisons | |
| **Defendants' Construction:**  storage of reference image data from the camera | |

Claim 1 of the '669 patent recites "reference memory." (A006, 6:40).  The reference memory

is "hardware for the storage and retrieval of data, which data may be used for comparisons." The specification describes that the data in the reference memory may contain data that is compared to data from the interpreter.  (A005, 3:35-37).  Multiple types of data can be stored in the reference memory, such as "license numbers for stolen cars."  (A005, 4:65-66).  Data obtained from the camera in the system can also be stored in the reference memory, as detailed in the specification:  the "reference memory receives data from the interpreter." (A005, 3:33-34).  In another embodiment, the reference memory stores "a pixel representation of all stationary objects on a shelf in the space at a selected time." (A005, 3:39-50; 3:57-58) (describing "pixels from the reference memory").

Data can also be retrieved from the reference memory and used for comparisons.  "A comparator 22 receives data from the interpreter 16 and reference memory 20 and compares these data according to comparison criteria." (A005, 3:35-37).  This is further described at column 4, lines 20-23, wherein "[i]mage data from the interpreter and the reference memory are compared by the comparator."  The retrieval of license plate numbers from the reference memory is described, as well. The license "numbers in the reference memory" can be retrieved and compared to license numbers detected in an image.  (A006, 5:1-5).  Adrain's construction is further supported by technical dictionary definitions.  The MCGRAW HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS (6th Ed. 2002) (A111), for example, defines "memory" as "any apparatus in which data may be stored and from which the same data may be retrieved."  *Id*. at 1308.

Defendants' construction of "reference memory" excludes several embodiments described in the specification.  Defendants' construction limits the reference memory to "image data *from the camera*." (emphasis added).  The specification of the '669 patent clearly describes several types of data that can be stored in the reference memory *other* than image data from the camera.  For

example, the specification specifically teaches that "[t]he reference memory can be divided into sections for storage of different types of data." (A005, 3:61-62).  The storage of license plate numbers in the reference memory is described in the specification at column 4, lines 65-66: "[t]he reference memory stores license numbers for stolen cars." (A005).  The specification does *not* indicate, as Defendants contend, that the data stored in the reference memory *must* be image data from the camera.  Defendants' construction would therefore exclude the embodiment described wherein license numbers for stolen cars are stored in the reference memory.  Defendants' construction can therefore not be the correct construction.

In view of this, the Court should adopt Adrain's construction of "reference memory" and construe the phrase as "hardware for the storage and retrieval of data, which data may be used for comparisons."

### 6. Reference Image Data

| | |
|---|---|
| **Adrain's Construction:** data used for comparisons, and can include license plate numbers or other types of data. | |
| **Defendants' Construction:** image data which has been stored in the reference memory | |

Claim 1 of the '669 patent recites "reference image data." (A006, 6:40).  Reference image data is related to "image data," described above in III.B.4.

The specification describes the "reference image data" as data that is stored in the "reference memory." (A005, 3:54-55).  This data is used in comparisons to image data from the interpreter: "a comparator is connected for comparing image data from the interpreter to image data from the reference memory." (A004, 1:45-47).

The data that makes up "reference image data" can be any type of data, including any of the types of data that the "image data" can be.  For instance, reference memory can include "license

numbers for stolen cars."  (A005-A006, 4:65-66; A006, 5:2-3).  The specification notes that the reference memory (which stores the reference image data), can be "divided into sections for storing *different types of data*," including an "archive section in which baseline image data are stored." (A005, 3:61-62) (emphasis added).

Defendants' construction of "reference image data" should be rejected to the extent that Defendants' construction of "image data" should be rejected.  Specifically, Defendants have proposed "digital data related to an image taken from a camera" as a construction for image data. Defendants' construction of "reference image data" incorporates Defendants' construction of "image data."  As noted above, this construction would exclude the preferred embodiment and cannot be correct.  *Sandisk Corp*, 415 F.3d at 1285.  Defendants' incorrect construction of "image data" therefore causes Defendants' construction of "reference image data" to be incorrect.

Accordingly, the Court should adopt Adrain's construction of the phrase "reference image data" and construe it to mean "data used for comparisons, and can include license plate numbers or other types of data."

### 7.    Comparing Image Data

| |
|---|
| **Adrain's Construction:**  no construction is necessary for this phrase, but if a construction is required, this phrase means determining the similarities and differences between the image data from interpreter and the image data from the reference memory. |
| **Defendants' Construction:** correlating image data from the reference memory to image data from the interpreter |

Adrain contends that no construction of this phrase is necessary.  "Comparing" is a commonly-understood word with no technical meaning.  No claim construction is necessary with respect to the phrase "comparing image data."

However, if the Court concludes that this phrase requires a construction, the Court should

construe it to mean "determining the similarities and differences between the image data from interpreter and the image data from the reference memory."  Adrain's proposed construction provides a definition for "comparing" that fits in the context of the claims and comports with the plain meaning of "comparing."  The '669 patent makes it clear that image data from the interpreter is compared to image data from the reference memory.  For example, the specification states "[i]mage data from the interpreter and the reference memory are compared by the comparator…according to the comparison criteria to determine correlation of the images.  For example, if the location of an object in the image data from the interpreter is not the same as the location of the same object in the reference memory, then the comparator sends an alarm signal."  (A005, 4:20-27).  The specification also states that when a detected object "meets the analysis criteria of a license plate, the number is compared to the numbers in the reference memory."  (A005, 4:65-5:6).

Defendants' construction merely parrots the claim language (albeit reversing "reference memory" and "interpreter") and replaces the word "comparing" with "correlating."  Defendants' "construction" offers no insight into the meaning of this phrase, and indeed indicates that something more than a comparison is required – a correlation.  There is no basis for this additional limitation in the intrinsic record.  Defendants' construction is therefore improper.

### 8.      Image Data From the Reference Memory

| **Adrain's Construction:**   no construction is necessary for this phrase, but if a construction is required, this phrase means image data that is stored in the reference memory. |
|---|
| **Defendants' Construction:**  image data which has been stored in the reference memory (same as "reference image data") |

Adrain contends that no construction of this phrase is necessary.  The phrase "image data from the reference memory" is composed of other phrases for which the parties are seeking

constructions, namely "image data" and "reference memory."  The only other word in this phrase is the word "from."  The word "from" is extremely well-known; it is a basic preposition in the English language.  Combining this simple word with the phrases "image data" and "reference memory" does not add complexity or uncertainty to the word.  In view of this, the phrase "image data from the reference memory" should have its plain meaning and needs no construction. Defendants' construction here is very similar to Adrain's construction.   Adrain contends, though, that a construction is simply not necessary for this phrase.

However, if the Court concludes that this phrase requires a construction, the Court should construe it to mean "image data that is stored in the reference memory."

Defendants' construction of this phrase underscores the fact that no construction is necessary for it.   The defendants have construed this phrase to have the exact same meaning as their construction for "reference image data."  Defendants' construction of this phrase is incorrect to the extent that the defendants' construction of "reference image data" is incorrect.   Further, the defendants' construction is merely a verbose restatement of the actual claim language that does nothing to clarify or define the scope of the claim.  It should therefore be rejected.

### 9.     Image Data Comparisons

| |
|---|
| **Adrain's Construction:**  no construction is necessary for this phrase, but if a construction is required, this phrase means comparisons between image data from the interpreter and image data from the reference memory performed by the comparator. |
| **Defendants' Construction:**  correlating image data from the reference memory to image data from the interpreter |

Adrain contends that no construction of this phrase is necessary.   "Comparisons," however, is a commonly-understood word with no technical meaning.   Accordingly, no claim construction is necessary with respect to the phrase "image data comparisons."

However, if the Court concludes that this phrase requires a construction, the Court should construe it to mean "comparisons between image data from the interpreter and image data from the reference memory performed by the comparator."  Adrain's proposed construction makes clear that the "image data" that is being compared is image data from the interpreter and image data from the reference memory.  This is spelled out in the specification, which states "[i]mage data from the interpreter and the reference memory are compared by the comparator…according to the comparison criteria to determine correlation of the images.  For example, if the location of an object in the image data from the interpreter is not the same as the location of the same object in the reference memory, then the comparator sends an alarm signal."  (A005, 4:20-27).  The specification also states that when a detected object "meets the analysis criteria of a license plate, the number is compared to the numbers in the reference memory."  (A005, 4:65-5:6).

Defendants' construction is identical to its construction of "image data comparisons," which merely parrots the claim language, with "correlating" standing in as a replacement for the word "comparing."  Defendants' construction here is incorrect for the same reasons Defendants' construction of "image data comparisons" is incorrect.

### 10.   Comparator

| |
|---|
| **Adrain's Construction:**  a microcomputer and/or associated software that compares the image data from the interpreter to the reference image data |
| **Defendants' Construction:**  determines a correlation between pixels from the reference image data and pixels from the image data |

Claim 1 of the '669 patent recites a "comparator."  Adrain's construction for this term is supported by the context of the claims and the specification.

The "comparator" in the '669 patent is simply hardware and/or software that compares the image data from the interpreter to the reference image data.  (A005-A006, 3:49-51; 5:1-3).  One function of the comparator is to "determine[] a correlation between pixels from the reference memory and pixels from the interpreter."  (A005, 3:38-40).  However, the comparator is not limited to just determining a correlation between pixels; the comparator more generally compares "image data from the interpreter and the reference memory."  (A005, 4:20-23).  For example, the comparator can compare a detected license plate number to a license plate number in the reference memory.  (A006, 5:1-6).  As described above, the image data includes more than pixel information.  The comparator is "preferably…integrated in a microcomputer and associated software."  (A005, 3:49-51).  The interpreter, programmer, reference memory, comparator, and output interface can be (but are not necessarily) one integrated unit.  *Id*.

Defendants' construction of "comparator" is too narrow and excludes a preferred embodiment described in the specification.  Specifically, because Defendants' construction requires that a correlation determination be made on "pixels" in the image data and reference image data, the embodiment described in the specification at 4:60-5:6 would be excluded.  (A005).  This section of the specification discusses "license numbers" stored in the reference memory.  *Id*.  The license numbers are compared to "the number" identified in an image received from the cameras.  *Id*.  This embodiment does not describe comparing "pixels," as the Defendants would require.  Rather, it's a numerical comparison.  Defendants' construction relies on a cherry-picked section of the specification and ignores the remaining portions of the specification.  Defendants' requirement that the comparator correlate only "pixels" would therefore exclude a preferred embodiment.  Defendants' construction is therefore improper.  *Sandisk Corp.*, 415 F.3d at 1285.

Accordingly, the Court should construe "comparator" to mean "a microcomputer and/or associated software that compares the image data from the interpreter to the reference image data."

### 11.    Comparison Criteria

| **Adrain's Construction:** rules used by the comparator for the comparison of data. |
|---|
| **Defendants' Construction:  NONE PROVIDED** |

Element (d) of claim 1 recites: "A comparator connected for comparing image data from the interpreter to image data from the reference memory according to selected comparison criteria." (A006, 6:41-43).   As explained in the specification, the comparator "receives data from the interpreter and reference memory and compares these data according to comparison criteria input by the programmer."  (A005, 3:35-38).   In the context of the specification and in light of Adrain's extrinsic evidence, "comparison criteria" unarguably means "rules used by the comparator for the comparison of data."

The specification establishes that the comparison criteria can include a number of different rules, the point of which is to "determine correlation" of the image data and reference image data input into the comparator.  (A005, 4:20-23).  The specification provides several examples of the types of rules that the comparison criteria could include.  For example, the comparison criteria can "include selecting images to be compared and a range of correlation in which the monitored image is sufficiently like the reference image for a particular purpose." (A005, 4:14-17).  The comparison criteria could also include "events or movements as well as stationary patterns."  (A005, 4:31-32). The comparison criteria could also include criteria or rules that are used to find a match between a license plate number captured from the attached camera and numbers in a database of stolen cars. (A005, 4:65-5:6).

The plain meaning of "criteria," as set forth in dictionaries adds support to construing "selected comparison criteria" to mean "rules used by the comparator for the comparison of data." For example, WEBSTER'S NEW WORLD COMPACT SCHOOL AND OFFICE DICTIONARY defines criterion as "a standard, rule, or test by which something can be judged." (WEBSTER'S NEW WORLD COMPACT SCHOOL AND OFFICE DICTIONARY, p.105 (3d Ed. 1995)) (A127).

Defendants have not offered a construction of this phrase.

Based on the intrinsic and extrinsic evidence, the phrase "selected comparison criteria" should be construed to mean "Rules used by the comparator for the comparison of data."

## 12.  Image Portions

| |
|---|
| **Adrain's Construction:**  no construction is necessary for this phrase, but if one is required, this phrase means less than one hundred percent of an image. |
| **Defendants' Construction:**  portions of an image (plain language definition) |

Adrain contends that no construction of this phrase is necessary.  This phrase is composed of two non-complex words that are very commonly-understood.  The Defendants concede that the this phrase should have its "plain language definition."  In fact, the Defendants' proposed construction merely reorders the words of the phrase.

However, if the Court concludes that this phrase requires a construction, the Court should construe it to mean "less than one hundred percent of an image."

## 13.  Monitoring System

| |
|---|
| **Adrain's Construction:**  a system for observing, recording, and/or analyzing the characteristics of a subject. |
| **Defendants' Construction:**  system for monitoring a space comprising a camera adapted for receiving images of a space to be monitored; an interpreter adapted for storing in the reference memory image data from the camera; a comparator connected to the interpreter for comparing image data from the interpreter to image data from the reference memory; and an output interface reporting results of the image data comparison performed by the comparator. |

The preamble of Claim 1 recites a "monitoring system."  This is not a complex or highly technical phrase.  Rather, it is intended to introduce the claim.  Adrain contends that this phrase be given its plain meaning:  "a system for observing, recording, and/or analyzing the characteristics of a subject."  "Monitoring" is a commonly-understood word.  Where commonly-understood words require construction, "little more [is involved] than the application of the widely accepted meaning of [the] commonly understood words."  *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001) (holding that the claims did not require elaborate interpretation).  "Monitoring system" is such a phrase; it is commonly-understood and does not require an elaborate interpretation.  Adrain's proposed construction is incorporates the plain meaning of the word "monitoring," as demonstrated by the dictionary definition of "monitor," which is "any device used to observe or measure a parameter." MODERN DICTIONARY OF ELECTRONICS, p. 482 (7th Ed. 1999).  (A122).

Defendants' construction of the phrase "monitoring system" is incorrect.  Defendants have essentially paraphrased the entirety of Claim 1 as their construction of this phrase.  Defendants seek to include numerous limitations in their construction of Claim 1 through their incorporation into the preamble of the claim.  For example, Defendants attempt to incorporate their incorrect construction of "image data" by way of sneaking it in through their construction of "monitoring system."  It is well-established, that the "preamble of a claim does not limit the scope of the claim when it merely states a purpose or intended use of the invention."  *In re Paulsen*, 30 F.3d 1475, 1479 (Fed. Cir. 1994).  A preamble is generally only considered to limit a claim where it gives "meaning to the claim and properly define[s] the invention."  *Id*.  A preamble is not limiting "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or

intended use for the invention." *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997).  "Monitoring

system," as used in Claim 1 of the '669 patent is merely introductory language.  It is not intended to

limit the claim, or to otherwise give meaning to the claim.  Defendants' proposed construction

merely paraphrasing the remainder of Claim 1 underscores the fact that Claim 1 lays out a

structurally complete invention, and that the preamble should not limit it.  *Id.*  Defendants' proposed

construction is unnecessarily elaborate, as well.  Defendants' construction of this phrase is incorrect.

Accordingly, the Court should adopt Adrain's construction of "monitoring system":  "a

system for observing, recording, and/or analyzing the characteristics of a subject."

### 14.     Output Interface

| |
|---|
| **Adrain's Construction:**  hardware that advises a user of the results of comparisons. |
| **Defendants' Construction:  NONE PROVIDED** |

Element (e) of claim 1 reads: "An **output interface** for reporting results of the image data

comparisons performed by the comparator."  (A006, 6:49-50).  The specification describes the output

interface as the component of the monitoring system that advises the user of the results of

comparisons.  Several examples of output interfaces are given in the specification, including "an

alarm panel, a memory interface, or a video monitor interface."  (A005, 3:42-44).  The output

interface is "preferably… integrated in a microcomputer and associated software." (A005, 3:49-51).

The specification further makes it clear that the output interface advises users of the results of

comparisons:

> "When the object meets the analysis criteria of a license plate, the number is
> compared to the numbers in the reference memory.  When the comparison finds a
> match, *an appropriate alarm indicates discovery of a stolen car to officers in the
> police car.*"

(A006, 5:1-6) (emphasis added).  In this example, the output interface sounds an alarm to advise the user (here, a police officer) of a match made by the comparison.  Other examples in the specification of the output interface advising users of the results of a comparison include:  "When an alarm condition arises in one space, its output is sent to the monitor" (A005, 4:48-4:51); "The output interface *reports* results of the comparison by selecting comparison data to be stored or otherwise utilized by a record memory or monitor" (A005, 3:44-47) (emphasis added); "An output interface *reports* results of the image data comparisons performed by the comparator" (A004, 1:47-49) (emphasis added).  It is clear that the output interface reports to (advises) the user of the results of comparisons.

Moreover, "interface" is a commonly used term in fields relating to MLPR, with a well-accepted definition.  The common definition for "interface" supports Adrain's construction here.  One such definition for "interface" is "[s]oftware that enables a program to *work with the user*…with another program…or with the computer's hardware." (MICROSOFT COMPUTER DICTIONARY, p. 241, 325 (4th Ed. 1999)) (emphasis added). (A116 – A117).

Defendants have not offered a construction of this phrase.

Based on this evidence, the phrase "output interface" should be construed to mean "Hardware that advises a user of the results of comparisons."

### C.      Claim 8 of the '669 Patent – The Record Memory

| | |
|---|---|
| **Adrain's Construction:**  hardware that can retain data. | |
| **Defendants' Construction:**  There is no "record memory" in Claim 1; thus, Claim 8 lacks proper antecedent basis per 35 U.S.C. 112. However, Defendants' offer the following definition:  connected for storing image data from the output interface | |

Claim 8 recites "A system according to Claim 1 wherein the record memory is adapted for storing information associated with the image data stored." (A007).  The phrase at issue in Claim 8 of the '669 patent is "record memory."  The meaning of this phrase is clear within the context of the claims, and from the intrinsic evidence.

The specification clearly sets out the meaning of "record memory" as a component of the monitoring system that "is adapted for storing information associated with the image data stored" and "for storing image data from the output interface." (A004, 1:65-67).  The plain meaning of "record memory," based on dictionary definitions, further supports the definition laid out in the specification.  For example, the act of recording can be defined as "to retain information." (MICROSOFT COMPUTER DICTIONARY, p.376 (4th Ed. 1999).  (A118).  A "record" would therefore be retained information.  "Memory" is defined by the as "any apparatus in which data may be stored and from which the same data may be retrieved."  (MCGRAW HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS, p. 1377 (6th Ed. 2002). (A111).  Accordingly, "record memory" is any apparatus in which data or information can be stored or retained.

Defendants assert that the record memory is indefinite and cannot be construed in the context of claim 8 on the grounds that the phrase "lacks an antecedent basis."  However, even if the "record memory" did lack an antecedent basis, the phrase can be construed.  The Federal Circuit has held that "the failure to provide explicit antecedent basis for terms does not always render a claim indefinite." *See Bose Corp. v. JBL, Inc.*, 274 F.3d 1354 (Fed. Cir. 2001) (quoting MPEP § 2173.05(e) (6th ed. Rev. 1, Sept. 1995)).  Indeed, the claim language should not be analyzed in a vacuum (as Defendants would do here), but rather "in light of the teachings of the prior art and of the particular application disclosure as it would be interpreted b one possessing the ordinary level of skill in the pertinent art."

*See In re Moore*, 439 F.2d 1232, 1235 (CCPA 1971).  Here, one possessing the ordinary level of skill in the pertinent art would have no trouble understanding the meaning of "record memory."  The plain meaning of the phrase, combined with the intrinsic evidence leaves no room for confusion as to its definition.

Therefore, in light of the intrinsic and extrinsic evidence, as well as the plain meaning of the phrase "record memory," the Court should construe the phrase "the record memory" to mean "hardware that can retain data."

## IV.    CONCLUSION

For the above reasons, Adrain requests that the Court adopt Adrain's claim constructions which are well grounded in the claim language, the intrinsic evidence, and the plain meaning of the terms as shown by the extrinsic evidence.

Respectfully submitted,

Dated:  February 13, 2012              By:  _/s/ John T. Polasek_____
                                             John T. Polasek
                                             Texas Bar. No. 16088590
                                             tpolasek@pqelaw.com
                                             C. Dale Quisenberry
                                             Texas Bar No. 24005040
                                             dquisenberry@pqelaw.com
                                             Jeffrey S. David
                                             Texas Bar No. 24053171
                                             jdavid@pqelaw.com
                                             POLASEK, QUISENBERRY & ERRINGTON, L.L.P.
                                             6750 West Loop South, Suite 920
                                             Bellaire, Texas 77401
                                             Telephone: (832) 778-6000
                                             Facsimile: (832) 778-6010

                                             S. Calvin Capshaw
                                             State Bar No. 03783900
                                             ccapshaw@mailbmc.com

Elizabeth L. DeRieux
State Bar No. 05770585
ederieux@mailbmc.com
Capshaw DeRieux, LLP
114 East Commerce Avenue
Gladewater, Texas  75647
Longview, Texas 75601-5157

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served this 13th day of February, 2012, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by, electronic mail, facsimile transmission and/or first class mail on this same date.

   /s/ John T. Polasek
John T. Polasek