# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

JOHN B. ADRAIN,

      Plaintiff,

      v.

VIGILANT VIDEO, INC. and THE CITY
OF PORT ARTHUR, TEXAS,

      Defendants.

Case No.  2:10-CV-173-JRG

**Jury Trial Demanded**

## CLAIM CONSTRUCTION BRIEF OF DEFENDANTS VIGILANT VIDEO, INC. AND THE CITY OF PORT ARTHUR TEXAS

Mark S. Hubert
Roy B. Thompson

*Attorneys for Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................... ii

1.    INTRODUCTION..................................................................... 1

2.    PRINCIPLES OF PROPER CLAIM CONSTRUCTION................................ 2

3.    BACKGROUND OF THE '669 PATENT........................................... 5

4.    THE ACCUSED SYSTEM............................................................ 5

5.    SYNOPSIS OF RELEVANT ARGUMENTS......................................... 8

6.    AGREED TERMS.................................................................... 9

7.    USPTO REEXAM PROSECUTORIAL HISTORY OF THE '669 PATENT.   9

8.    CONSTRUCTION OF DISPUTED CLAIM TERMS................................. 12

      A.    CAMERA.................................................................... 12

      B.    IMAGE DATA.............................................................. 14

      C.    REFERENCE MEMORY.................................................... 21

      D.    REFERENCE IMAGE DATA............................................... 22

      E.    INTERPRETER.............................................................. 23

      F.    COMPARATOR............................................................. 24

      G.    MONITORING SYSTEM.................................................... 25

      H.    MOVABLY MOUNTED..................................................... 26

      I.    OUTPUT INTERFACE...................................................... 27

      J.    RECORD MEMORY........................................................ 28

9.    CONCLUSION....................................................................... 28

i

# TABLE OF AUTHORITIES

## CASES

*Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573 (Fed. Cir. 1996) ........ 12

*Chef America, Inc., v. Lamb-Weston, Inc.*, 358 F.3d 1371 (Fed. Cir. 2004) ........... 17

*Chimie v. PPG Indus,. Inc.*, 402 F.3d 1371 (Fed. Cir. 2005) ................................ 12

*Desper Prods. Inc. v. QSound Labs. Inc.*, 157 F3d 1325 (Fed. Cir. 1998) ............... 4

*Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366 (Fed.Cir.2007) ........ 13

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 US 722 (2002) .......... 4

*Harris Corp. v. IXYS Corp.*, 114 F.3d 1149 (Fed. Cir. 1997)................................. 15

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,

    381 F.3d 1111 (Fed. Cir. 2004)..................................................... 3, 15, 25

*Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373 (Fed. Cir. 2002). 11

*Markman v. Westview Instruments, Inc.*,

    52 F.3d 967 (Fed. Cir. 1995), *aff'd* 517 U.S. 370 ................................... 2

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003) ................... 11, 14

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ............................... 3, 4, 11

*Schering Corp. v. Amgen, Inc.*, 222 F.3d 1237 (Fed. Cir. 2000) ........................ 19

*Southwall Techs,. Inc. v. Cardinal IG Co.*, 54 F.3d 1570 (Fed. Cir 1995)....................... 4, 29

*Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448 (Fed. Cir. 1985) ............... 11, 14

*Vitronics Corp. v. Conceptronic*, 90 F.3d 1576 (Fed. Cir. 1996) ................... 3, 4, 25, 29

*Watts v. XL Sys., Inc.*, 232 F.3d 877 (Fed. Cir. 2000) ................................ 4

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,

    442 F.3d 1322 (Fed. Cir. 2006)............................................................. 5

## OTHER AUTHORITIES

## STATUTES/REGULATIONS

37 C.F.R. 1550(c) ……………................................................................................   10

37 C.F.R. 1.304 ……………………………………................................................   10

1.   INTRODUCTION

Plaintiffs alleges Defendants have infringed his U.S. Patent No. 5,381,669 ("the '669 Patent)

titled "Facility Monitoring System with Image Memory and Correlation" (Exhibit A), which relates

generally to "monitoring and security and specifically to a system that records images and identifies

correlation or lack of correlation with the images." '669 Patent at Column. 1, lines 7-10.  The '669

Patent claims receiving image data from a camera and comparing this image data from the camera

to earlier, stored image data from the same camera, and reporting the comparison results.  More

particularly, the '669 Patent describes and claims a system[1] having a movably mounted camera, an

interpreter that "receives images data from the camera," a reference memory "that stores reference

image data," a "comparator," and an output interface, which are used for monitoring a space by,

among other limitations, "comparing image data from the interpreter to image data from the

reference memory." ['669 Patent, Claim 1]

Plaintiff, with his proposed definitions, attempts to broaden the scope of his patent well

beyond its claims and well beyond what he has surrendered in prosecutorial estoppel.  While it is

clear that the '669 patent entails and claims a system that compares digital images to other digital

images, Plaintiff is attempting to eliminate "images" and "digital", and substitute "data" so as to

ensnare others' systems (digital or analog), that optically recognize license plate alphanumeric

character strings from photos and compares them to license plate hot lists from a database (non-

image data).  Plaintiff alleges that his patent, if twisted and contorted in this way, is not restricted

to comparing images (or image data), and offers claim construction that, if accepted, would

---

1

Although the '669 Patent also includes method claims, only independent system claim 1 and seven
system claims dependent on claim 1 are asserted in this action.

seemingly cover any system that compares "data" rather than "image data." Not only are such theories contradicted by the specification and file history of the '669 Patent, but the '669 Patent would easily be rendered invalid by such an interpretation. Additionally, Plaintiff chooses to ignore that he has surrendered the analog aspect of his system and can only lay claim to a "digital" camera that takes "digital" image data and an interpreter that receives only "digital" image data. Plaintiff has surrendered any analog aspect of his system in statements and proposed amendments he has made in the current reexamination.

Plaintiff is in a difficult position. He paints one picture of the scope of his claims to the Patent Office for allowance and a completely different picture to this Court for enforcement of his patent. If the patent is interpreted as Plaintiff contends, it is easily invalidated by a plethora of prior art. Alternatively, if the patent is read as Defendant contends (and consistent with the specification and plain meaning) the patent is not infringed (and is likely still invalid). Ultimately, this case can be resolved by the Court's claim construction. Both sides have settled on their respective claim construction arguments, and the issue is ripe for a determination.

It is also to be noted that all of the claims that are allegedly infringed have now been twice and finally rejected by the US Patent Office in an *Ex Parte* Reexamination. (USPTO Reexamination 90/011,233 – see Final Rejection and Office Advisory Action - Exhibits B and C.) The first rejection was on the claims as they are in the original, allowed '669 patent. The second and final rejection was on these claims as narrowed and amended in Plaintiff's response to the *Ex Parte* Reexamination. Plaintiff must now file an appeal in an attempt to retain any of these claims.

2.     PRINCIPLES OF PROPER CLAIM CONSTRUCTION

Claim construction is a legal issue to be resolved by the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977 (Fed. Cir. 1995), *aff'd* 517 U.S. 370 (1996). In construing the

claims of a patent, the Court must first focus on the intrinsic evidence of each patent, i.e. the claims, specification and prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*). Where the intrinsic evidence resolves any ambiguity in a claim term, it is improper to rely on extrinsic evidence (e.g., expert testimony, treatises and dictionaries) to determine the meaning of the claim terms. *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1583 (Fed. Cir. 1996); *Phillips*, 415 F.3d at 1317.

A court first looks to the claims themselves to define the scope of an invention. *Vitronics*, 90 F.3d at 1582. Words in a claim are generally given their ordinary and customary meaning, unless otherwise clearly defined in the intrinsic evidence. *Vitronics*, 90 F.3d at 1582; *Phillips*, 415 F.3d at 1312. If a claim term has a plain and unambiguous meaning, not specifically contradicted by anything in the specification, that plain meaning will be applied even if the result is to make the claimed invention inoperative. A claim should not be construed to leave words without meaning or influence upon the scope of the claim. The patentee is presumed to have intended every word chosen for use in a claim to have specific function in adding to the meaning of that claim. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, Inc., 381 F.3d 1111, 1119 (Fed. Cir. 2004). Second, a court looks to the specification to determine if the terms are defined, either expressly or by implication. *Vitronics*, 90 F.3d at 1582. Third, a court should consider the prosecution history of the patent. *Phillips*, 415 F.3d at 1317 (citing, inter alia, *Markman*, 52 F.3d at 980; *Graham v. John Deere Co.*, 383 U.S. 1, 33 (1966)). "[T]he prosecution history provides evidence of how the USPTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. This history "consists of the complete record of all the proceedings before the PTO" (*Id.*), including any express representations made by the applicant regarding the scope of the claims. "The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during

3

prosecution." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995). The plaintiff is barred from advancing a construction that controverts the plaintiff's statements to the Patent and Trademark Office contained in the prosecution history. *Watts v. XL Sys., Inc.*, 232 F.3d 877, 883 (Fed.Cir. 2000). "As such, the record before the Patent and Trademark Office is often of critical significance in determining the meaning of the claims." *Vitronics*, 90 F.3d at 1582.

The prosecution history is intrinsic evidence. *Vitronics*, 90 F.3d at 1582. The public has the right to rely on an applicant's remarks made in seeking allowance of claims. *Desper Prods. Inc. v. QSound Labs. Inc.*, 157 F.3d 1325, 1337 (Fed. Cir. 1998). To provide certainty and predictability as to the scope of patent protection, the public must have notice as to the extent of a patent holder's property rights. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 US 722, 731 (2002).

Extrinsic evidence includes everything external to the patent and prosecution history, including dictionaries, learned treatises and expert testimony. *Phillips*, 415 F.3d at 1317. While the Federal Circuit has noted that extrinsic evidence may be useful in claim construction, it warned that such use "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319. Because of the expansive definitions found in dictionaries, their use to interpret claim terms "may extend patent protection beyond what should properly be afforded by the inventor's patent." *Id.* at 1322. Importantly, dictionaries cannot be used when the definition contradicts a definition found in or determined by a reading of the intrinsic evidence.

> "The claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely. In other words, **competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention**. Allowing the public record to be altered or changed by extrinsic evidence introduced at trial, such as expert testimony, would make this right meaningless." *Vitronics*, 90 F.3d at 1584,

4

n. 6, (internal citations omitted) (emphasis added).

3.    BACKGROUND OF THE '669 PATENT

In the abstract of the '669 Patent, the inventor described his invention as follows: "A video image of a space is monitored and compared to a reference image. Correlation of the images indicates the presence of unwanted persons or objects or the occurrence of unwanted events…" '669 Patent, Abstract. The specification describes the invention as shown in Fig. 1 of the '669 Patent [also found on the cover of Exhibit A].

The camera 12/13 receives an image (or images) and provides "image data to an interpreter 16." '669 Patent, Col. 3, ll. 27-28. "The interpreter 16 selects image data from the cameras 12, 13 according to analysis criteria input from a programmer." '669 Patent, Col. 3, ll. 28-30. "A reference memory 20 receives image data from the interpreter 16 according to storage criteria input to the interpreter by the programmer 18." '669 Patent, Col. 3, ll. 33-35. "The comparator 22 determines a correlation between pixels from the reference memory 20 and pixels from the interpreter 16." '669 Patent, Col. 3, ll. 33-40. The specification further explains that "[i]mage data from the interpreter and the reference memory are compared by the comparator 22 according to the comparison criteria to determine correlation of the images." '669 Patent, Col. 4, ll. 20-23. Thus, accordingly to the '669 Patent, by comparing images received from the interpreter to reference images from the interpreter, a space [14] can be monitored, either "in real time or using images collected previously." '669 Patent, Col. 4, ll. 20-23, Col. 6, ll. 20-21.

4.    THE ACCUSED SYSTEM

The Court need not construe the terms in a vacuum. "[K]nowledge of [the] product or process [accused of infringement] provides meaningful context for the first step of the infringement analysis, claim construction." *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d

1322, 1326-27 (Fed. Cir. 2006).  The system accused of infringement by Plaintiff is Vigilant Video

Inc.'s CarDetector Mobile License Plate Recognition System, which is marketed and sold primarily

to law enforcement and other government agencies.





Vigilant Video's CarDetector system uses a pair of vehicle mounted analog cameras that output an analog NTSC TV video signal of license plates from passing cars. The signals are transferred to a signal processing unit called the DSP engine that receives and converts the analog video signal into digital still bitmapped images at a rate of 30 per second. These images undergo several processes of analysis and confidence checking to optically recognize the alphanumeric characters of the license plates. Eventually, the still images are converted into an alphanumeric

7

character string. This character string is checked against a "hot list" of license plate numbers that are accessed from a remote database. When a match is found, an alarm signal is sent to a mobile display unit in the vehicle for further action. There is no image to image comparison.

Importantly, the images from the camera are output in analog form and the further processing devices receive an analog image input. There is no comparison of any images, nor is there any comparison to any other images taken by the camera at a earlier time that have been stored in memory. Comparisons are only done between alphanumeric character strings that are not images. The database does not contain or rely on reference images.

5.    SYNOPSIS OF RELEVANT ARGUMENTS

In this dispute, understanding Vigilant Video's system sheds light on Plaintiff's proposed construction. For example, to infringe Claim 1, the accused system must compare "image data from the interpreter to image data from the reference memory..." '669 Patent, Claim 1. (Claim 1 is the only independent claim.) Vigilant Video's CarDetector system does not compare image data from the plate capture camera to any other image data. Instead, the image data from the plate capture camera is converted to text and compared to a alphanumeric character strings in a remote database. Nonetheless, in an attempt to establish infringement, Plaintiff proposes a broad definition of the term "image data" that eliminates the limiting modifier "image" and results in the encompassing of just "data." With this proposed claim construction, Plaintiff also argues that the image data in the reference memory is simply data input to the memory. Under Plaintiff's construction, any data in a database would seemingly qualify as image data, without any relationship to an image. This type of contorted claim construction attempts to ignore a critical claim element modifier - image. Lastly, Plaintiff argues that his "camera" is any camera not a "digital camera limited to directly outputting digital image data" and similarly that his "interpreter" is not limited to receiving "said digital image

8

data from the digital camera." These proffered claim constructions of the Plaintiff simply are not correct as they ignore what he has surrendered. As set forth below, Plaintiff's proposed claim constructions are crafted with an eye towards infringement, and are contrary to the claims, the prosecution history, and the specification of the '669 Patent. Plaintiff's proposed claim constructions should be rejected.

6.    AGREED TERMS

As set forth in Plaintiff's brief, the parties have agreed upon the following definitions: "programmer", "analysis criteria", "cooperate" and "utilization criteria." Additionally, Defendants are willing to agree with Plaintiff's following proposed claim constructions as after further review, the differences are insubstantial and inconsequential to this case.

| Comparing image data | Determining the similarities and differences between the image data from the interpreter and image data from the reference memory |
|---|---|
| Image data from reference memory | No construction necessary |
| Image data comparisons | No construction necessary |
| Comparison criteria | Rules used by the comparator for the comparison of data |
| Image portions | No construction needed |
| Space to be monitored | Any area that is imaged by the moveably mounted camera, which area can change according to movements of the movable support |

7.    USPTO REEXAM PROSECUTORIAL HISTORY

All the alleged infringement in this case stems from the single independent Claim 1 and those claims that depend from it. This independent claim is one of the claims that has just undergone a reexamination proceeding by the USPTO. The following timeline details the current status of this patent's prosecutorial history with respect to the claims at issue. As it stands today, Claims 1-3 and 7-11 are finally rejected (as of November 23, 2011) in reexamination and Patentee must file (or must

have filed) an appeal to the USPTO no later than Feb 23, 2012, three months after the final rejection. 37 CFR 1.550(c), cited in Exhibit C.  He then may file an appeal to the U.S. Court of Appeals for the Federal Circuit within two months from the date of the decision of the Board of Patent Appeals and Interferences.  37 CFR 1.304

### Timeline

| | |
|---|---|
| June 9, 1996 | Patent Application filed |
| Jan 6, 1997 | 1st Office Action – rejection (all 32 claims rejected as obvious) |
| April 14, 1997 | Patentee's 1st Response – amend claim 1 to incorporate "moveably mounted" |
| July 9, 1997 | Patentee files a Continued Prosecution Application with amendments |
| August 5, 1997 | 2nd Office Action – rejection of all claims as amended |
| Jan 20, 1998 | Meeting between Examiner and Patentee - Claims amended (comparator and interpreter operation included) |
| November 3, 1998 | Patent Issues |
| September 14, 2010 | Ex parte Rexamination filed by Defendants (Claims 1-3 & 7-11) |
| June 3, 2011 | 3rd Office Action (all claims reexamined are rejected) |
| July 27, 2011 | Interview between Examiner and Patentee (discuss proposed digital camera limitation and amendments to claims) |
| August 3, 2011 | Patentee's Amendment A Response – (amend to "digital camera" and "for outputting digital image data" and interpreter for receiving "said digital image data from the digital camera") |
| September 2, 2011 | Patentee's Supplemental Reexam Response A2 (same as above with certificate of service included) |
| November 23, 2011 | 4th Office Action – (Final Rejection of all amended claims 1-3 and 7-11 |

including warning for Patentee to file a timely appeal)

January 19, 2012        Patentee's Amendment B Response - (amend Claim 1 to digital camera "for

                        directly outputting digital image data")

February 10, 2012       Office Advisory Action – (Patentee's Amendment B does not overcome 4th

                        Office action's Final Rejection - Claims 1-3 and 7-11 remain finally rejected

                        - Exhibit C)

During the reexamination prosecution, in Plaintiff's January 19, 2012 Amendment B at page

16 paragraph 4, and page 17 paragraph 2, (Exhibit D) Plaintiff acknowledged the prior art clearly

utilized analog cameras and argued that a limitation directed at digital cameras was a patentable

distinction of Claim 1. Therein, Plaintiff repeatedly sought to distinguish his claimed device from

the prior art on the basis of their device's use of a digital camera that directly output digital image

data and an interpreter that receive that digital image data. Plaintiff is estopped by prosecution

history disclaimer from arguing otherwise in litigation. "[W]here the patentee has unequivocally

disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and

narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega

Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). "[T]he prosecution history (or file

wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been

disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co.

v. Am. Cyanamid Co.,* 774 F.2d 448, 452 (Fed. Cir. 1985). Here, the Plaintiff clearly and

unequivocally disavowed or disclaimed the use of an analog camera, in favor of specifying a digital

camera with digital output.

Plaintiff cites three cases: *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005);

*Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380-82 (Fed. Cir. 2002); and

*Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996), all for the general proposition that if there is ambiguity or lack of clarity, the prosecution history becomes less relevant to claim construction. <u>That is not the case here</u>. His statements and intentions are unequivocally clear. Plaintiff then acknowledges that one purpose of consulting the prosecution history in construing a claim is "to exclude any interpretation that was disclaimed during prosecution" and correctly cites *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005.) Simply stated, Plaintiff does not want the Court to consider the true meaning of what his patent Claims envelop and what limitations he has admitted to and surrendered during the further prosecution of the '669 patent. To do so would render Defendant's systems non-infringing.

8.    CONSTRUCTION OF DISPUTED CLAIM TERMS

A.    "Camera"

| | |
|---|---|
| **Defendants' Proposed Construction:** | A digital camera that directly outputs digital image data |
| **Plaintiff's Proposed Construction:** | No construction needed |
| | |

In the reexamination proceeding, Plaintiff's August 3, 2011 Amendment A Response (Exhibit E) narrowed "camera" to "digital camera" in an attempt (albeit unsuccessful) to avoid rejection in light of the prior art, and disavowing the use of an analog camera.

Adrain/Plaintiff's Amendment A Response 12:2   "Claims 1 and 11 have been amended to recite that the camera is a digital camera and that it is for outputting digital image data."

Adrain/Plaintiff's Amendment A Response 16:3-6   "Claims 1-3 and 8-11 were rejected under 35 U.S.C. § 102(b) as being anticipated by Netravali et al. (U.S. 4,611,347). Claim 7 was rejected under 35 U.S.C. § 103(a) as being unpatentable over Netravali in view of Hwang (U.S. 5,425,108). For the following reasons, the rejection is respectfully traversed.
    As discussed at the personal interview, claims 1 and 11 have been amended to recite that the camera is a digital camera, and that the camera outputs digital image data. In contrast, the Netravali camera outputs analog image data, as an A/D converter 202 is provided at the output of the camera 203 as shown in Fig. 2, and discussed at col. 2, lines 65-68. Thus Netravali fails to teach the use of a digital camera for outputting digital image data. Furthermore, as also discussed, claims 1 and 11 recite a moveably mounted camera. Although the Examiner cites Netravali at col 2 as teaching such

12

a feature, a review of this section shows no such teaching found in the cited section, and after a review of the entire reference, no such feature could be found.

Accordingly, for at least one or both of the above reasons, claims 1 and 11, and the claims dependent thereon, are patentable over Netravali."

Plaintiff's January 19, 2012 Amendment B Response (Exhibit D) further narrowed "digital camera" to "a digital camera for <u>directly</u> outputting digital image data," again disavowing an analog camera in a second attempt to avoid the Patent office's rejection of his earlier proposed claim amendment (also unsuccessful.)

Plaintiff's Reexam Amendment B Response 11:2 "Claims 1 and 11 have been further amended to recite that the digital camera is for <u>directly</u> outputting digital image data."

Plaintiff's Reexam Amendment B Response 16:2 "Claims 1-3, 7-11, 28, 49-50, and 55-56 were rejected under 35 U.S.C. §103(a) as being unpatentable over Netravali et al. (U.S. 4,611,347) in view of Hwang (U.S. 5,425,108). Claims 22, 26, and 51-54 were rejected under 35 U.S.C. §103(a) as being unpatentable over Netravali in view of Hwang, and in further view of Boyette (U.S. 5,097,328). For the following reasons, the rejections are respectfully traversed. As discussed in detail at the personal interview, claims 1 and 11 recite that the camera is a digital camera, and the claims have been further amended to recite that the camera directly outputs digital image data. At the personal interview, this feature was discussed, and it was pointed out that the cited prior art clearly utilized analog cameras, and did not suggest the use of any digital cameras, and the examiners agreed to consider this distinction if provided in the claim language. . . . Thus the cited claims are patentable over the combination of Netravali and Hwang, as are the claims dependent thereon."

Prosecution disclaimer occurs when a patentee, either through argument or amendment, surrenders "claim scope during prosecution before the PTO, [and] the ordinary and customary meaning of a claim term may not apply." *Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1371 (Fed.Cir.2007). "Further, the prosecution history (sometimes called 'file wrapper and contents') of the patent consists of the entire record of proceedings in the Patent and Trademark Office. This includes all express representations made by or on behalf of the applicant to the examiner to induce a patent grant, or, as here, to reissue a patent. Such representations include amendments to the claims and arguments made to convince the examiner that the claimed invention meets the statutory requirements of novelty, utility, and nonobviousness. Thus, the prosecution

13

history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452, (Fed.Cir. 1985).  Amendments or arguments that are merely vague, ambiguous, or subject to other reasonable interpretation are not sufficient to surrender claim scope. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed.Cir. 2003).  Rather, in order for prosecution disclaimer to attach, the patentee's actions must be "clear and unmistakable." *Id.* at 1326.  In *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1342 (Fed.Cir.2001) the Court of Appeals went to great lengths to explain that in order to disavow claim scope, a patent applicant must clearly and unambiguously express surrender of subject matter during prosecution.  Here the Plaintiff's actions were exactly that - several clear and unambiguous express surrenders of "camera" for that of "digital camera that directly outputs digital image data" for without the narrowing amendments of "digital" and "for directly outputting digital image data," Claim 1 would not have had a chance of surviving the Patent Office's obviousness rejection.

Defendants argue that the proper definition for Plaintiff's "camera" is "a digital camera that directly outputs digital image data," and any claim construction of "camera" must at a minimum also contain the modifier "digital" as analog cameras have clearly been disclaimed in order to attempt to get claim allowance.  Plaintiff cannot maintain an analog camera for purposes of infringement actions and a digital camera for purposes of reexamination.

B.      "Image Data"

| **Defendants' Proposed Construction**:   digital data related to an image taken from a camera |
| **Plaintiff's Proposed Construction**:   Data that is input to the interpreter, including data representative of a license plate number, or other types of data |

To maintain its position that Defendants have infringed the '669 Patent, Plaintiff must

divorce the modifier "image" from "image data" and further, disregard their prosecutorial history statements that "image data" must be "digital image data" that is directly output from a digital camera. Plaintiff proposes an unsupported broad definition that writes the claim term "image" and "digital" right out of the claim. Defendants' definition just uses Plaintiff's own language in the specification and his statements to the Patent Office.

"While not an absolute rule, all claim terms are presumed to have meaning in a claim." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004). A claim should not be construed to leave words without meaning or influence upon the scope of the claim. See *Harris Corp. v. IXYS Corp.*, 114 F.3d 1149 (Fed.Cir. 1997.) Since the patent is presumed to have intended every word chosen for use in a claim to have a specific function in adding to the meaning of that claim, the image component cannot be divorced from the definition of "image data." It is <u>images</u> that are collected and compared - not raw data. Plaintiff's patent is devoid of a definition for "image data" and replete with references to the image component of "image data." The word "image" appears over 100 times in the seven-page '669 Patent, and the phrase "image data" appears over 30 times in the '669 Patent claims. Although data itself is mentioned, it is never mentioned in the patent's specification as coming from a camera. All instances of "data" in the specification relate to actions of the comparator memory or output interface – never with regards to the camera.

Plaintiff proffers a definition for the claim term "image data" that reads the word "image" out of this limitation in every claim. Reading the specification of the '669 patent it is clear that "image" in the term "image data" of the claims is inextricably intertwined as the backbone of Plaintiff's system is the comparison of images. The following are but a few of the many examples that the defendants can offer:

Abstract  "A video **image** of a space is monitored and compared to a reference **image**. Correlation of the images indicates presence of unwanted persons or objects or the occurrence of unwanted events."

Patent 1:6-9  "This invention relates generally to the field of monitoring and security and specifically to a system that records **images** and identifies correlation or lack of correlation with the **images**."

Patent 1:41-49  "The present invention provides a monitoring system having a camera adapted for receiving **images** of a space to be monitored. An interpreter receives **image data** from the camera, and a reference memory stores reference **image data**. A comparator is connected for comparing **image data** from the interpreter to **image data** from the reference memory according to selected comparison criteria. An output interface reports results of the **image data** comparisons performed by the comparator."

Patent 2:32-43  "The invention also provides a method of monitoring a space. Method steps include receiving a first set of **image data** from the space; identifying and selecting a portion of the information to be stored according to analysis and learn criteria; storing the selected information; receiving a second set of **image data** from the space; identifying and selecting a portion of the second set of **image data** to be analyzed according to the analysis criteria; comparing the selected portions of the sets of **image data** to each other so as to determine a correlation of the **images**; and indicating whether the correlation of the **images** meets selected comparison criteria."

Patent 4:14-23  "The user also inputs comparison criteria. Comparison criteria include selecting the **images** to be compared and a range of correlation in which the monitored **image** is sufficiently like the reference **image** for a particular purpose. For example, stationary object **images** and monitored **images** are compared to determine whether any object previously identified as stationary is not in its previous location. **Image data** from the interpreter and the reference memory are compared by the comparator 22 according to the comparison criteria to determine correlation of the images."

Plaintiff's definition of "image data" is "data that is input to the interpreter, including data representative of a license plate number, or other types of data." Simply stated, this broad definition represents just "data" – of any type. Plaintiff, on page 11 of his brief, cites to an embodiment of his invention wherein a camera on a police car can monitor license plate numbers to support his definition. There are several flaws in this logic. First, the description of that embodiment does not use the term "image." As is well known, patent specifications generally disclose several different variations or embodiments of the invention, and generally try to capture them in the dependent

16

claims. That is not what the Plaintiff has done in his patent. Defendants acknowledge that there are other types of data other than visual images described in the patent. Column 6, lines 14-16 states: "Data other than visual images can also be analyzed. For example, thermal images can be used to sense overheating of equipment or fires in facilities. Micropower impulse radar (MIR) can be used to monitor spaces through smoke, walls, or other opaque materials. Different types of cameras or cameras collecting different types of image data can be combined." However, despite this one brief inclusion, Plaintiff chose to only claim "image data." None of the Plaintiff's dependent claims attempt to incorporate a system that uses thermal images, microwave impulse radar or that monitors license plate numbers. It is the claims that define the scope of what the patentee has the right to sue for infringement on. Plaintiff is ignoring what he has said is his invention in the claims and is focusing on what he could have possibly claimed. If Plaintiff intended to include all the embodiments in his specification he should have done so. As such, he does not get to define claim terms that will go back and recapture what he has deliberately chosen to omit. "[I]n accord with our settled practice we construe the claim as written, not as the patentees wish they had written it." *Chef America, Inc., v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (2004). Second, although Plaintiff argues that images other than visual images can be analyzed and that the specification references that image data can consist of license plate numbers wherein the numbers can be compared to the numbers in the reference memory, he stops short of drawing attention to further statements in the specification and prosecution history that clearly show that his license plate number embodiment compares the **images** of the license plate not optical characterization of the license plate numbers. Plaintiff's specification supports Defendant's last statement as follows:

'669 Patent 5:7-10   "The invention, as shown for example in FIGS. 1 and 2, can be used in numerous methods of operation. The license plate example utilizes a high degree of correlation between the reference **image** and the monitored **image**."

17

<u>Plaintiff's Office Action Response of April 14, 1997 [Exhibit F] 5:3</u>  "As the space being monitored changes, the interpreter selects certain parts of the **image** for comparison and disregards other parts of the **image** according to analysis criteria from the programmer. For example, a system seeking license plates would only make comparisons when a license plate is discovered.  The comparison could be limited to the license plate without regard for surrounding **images**."

The disclosure in the '669 specification that Plaintiff cites reads:

"For example, the camera can be mounted on a police car and programmed to monitor license plate numbers. The reference memory stores license numbers for stolen cars. Analysis is limited to consistently sized characters within a specified boundary, that is the rectangular shape of the license plate. When the object 32 meets the analysis criteria of a license plate, the number is compared to the numbers in the reference memory."

This must be read in light of Claim 1 which states:
1. A monitoring system comprising:
  a movably mounted camera adapted for receiving images of a space to be monitored;
  an interpreter for receiving image data from the camera;
  a reference memory for storing reference image data;
  a comparator connected for comparing image data from the interpreter to image data
    from the reference memory according to selected comparison criteria,
    wherein the interpreter and comparator cooperate to select recognizable
    portions of image data among unrecognized portions of image data in the
    space being monitored, the selected image portions being compared to the
    image data in the reference memory; and
  an output interface for reporting results of the image data comparisons performed by
    the comparator.

Plaintiff disclosed briefly a system that may indeed "monitor license plate numbers" but it does this as an <u>image correlation</u> not as an alphanumeric character string (number) comparison. It is the camera that monitors the license plates. Then as claimed, the "image data" from the camera is sent to the interpreter. The images of the license number are what is being compared to each other, not optically recognized alphanumeric character strings. To do what Plaintiff is suggesting requires optical character recognition – which cannot be done by a camera and which is never discussed in his specification. Plaintiff's prosecution history during the reexam further supports this.

<u>Plaintiff's Reexam Amendment B Response 11:2</u>   "Claims 1 and 11 have been further

18

amended to recite that the digital camera is for <u>directly</u> outputting digital image data."

How do any of the claims get license plate numbers from a digital image from the camera? Where is this step and where is it mentioned?  From the camera, the directly output digital "image data" goes only to the interpreter.  The specification and FIG.1 make this abundantly clear.  Plaintiff cannot contend that data in the form of license plate numbers comes from a camera.  The Plaintiff's system whether dealing with license plates or a space to be monitored, works on images and hence the term "image data" in the claims.

Third, when a party argues that the ordinary meaning of a term in a claim is not applicable, but that the patentee intended to apply a special meaning to the term, then the court must look to the specification for clear indicators that the patentee intended a special definition to apply.  The court looks for an "express intent to impart a novel meaning" to "claim terms." *Schering Corp. v. Amgen, Inc.*, 222 F.3d 1237, 1353 (Fed.Cir. 2000.)  There is no such express intent of the Plaintiff that can be found anywhere to indicate that "image data" was just "data."  Image data is not defined in the '669 specification.  Looking to other claims of the '669 Patent, Defendants' proposed definition is further supported.  For example, in unasserted Claim 11, the camera receives images and then provides image data to the interpreter.  Similarly, unasserted Claim 12 further limits the invention to receiving sets of image data representing plural images.  Accordingly, Defendant's proposed definition is confirmed and consistent with the usage of the term "image data" as used in both the claims and specification of the '669 Patent.

Further, prosecutorial estoppel restricts Plaintiff's claims 1 – 11 to cover only digital image data taken from a digital camera.

Plaintiff's Reexam Amendment A Response 12:2  "Claims 1 and 11 have been amended to recite that the camera is a digital camera and that it is for outputting digital image data."

As discussed above, in both Plaintiff's Amendment A and Amendment B Responses to the Reexamination by the Patent Office, the Plaintiff narrowed the scope of his independent Claim1 to be digital "image data" taken from a <u>digital</u> camera. (All of the claims asserted against Defendants depend from the amended Claim 1 and thus incorporate this "<u>digital</u>" limitation.) **Analog** "image data" was surrendered in an attempt (albeit unsuccessful) to get around the Patent Examiner's rejections of Claim 1 on grounds of obviousness. As discussed above under the claim construction argument for "camera" in his Amendments to the patent reexamination, the Plaintiff narrowed "image data" to be "digital image data." Without the inclusion of "digital" in the claim construction of "image data" would allow the Plaintiff to sue any non-digital system, essentially "reaping where he has not sowed." Gospel of Matthew, 25:26.

Although the '669 Patent does not specifically define the image data related to an image, the principal type of data discussed in the specification is pixels. '669 Patent, Col. 3, ll. 33-4, 55-58; Col. 4, ll. 32-36; Col. 5, ll. 26-30. This makes sense, as the images received by a camera can be digitized into pixels for analysis. Although not described in detail in the patent, other types of non-visual image data could conceivably be received from the camera and used for comparison. For example, the specification explains that "[d]ata other than visual images can also be analyzed…[d]ifferent types of cameras or cameras collecting different types of image data can be combined." '669 Patent, Col. 6, ll. 10-16. The specification provides several examples of non-visual cameras, such as thermal and radar cameras, that could be used in other embodiments and provide non-visual image data. '669 Patent, Col. 6, ll. 10-19. Data from any of these embodiments fall within Defendants' proposed definition, as this data would be related to images obtained by any camera, whether from visual or non-visual images.

Although Defendants contend there is no support for the Plaintiff's proposed meaning,

Defendants do not dispute that many "types of data," including data related to license plates, could conceivably be "image data." But any such data must be related to an image, as set forth in the claims and described in the specification. For example, the specification describes storing license plate numbers in the reference memory, but further explains that "the license plate example utilizes a high degree of correlation between the reference **image** and the monitored." '669 Patent, Col. 5, ll. 7-10. In other words, the license plate "data" correlates to <u>images</u>, and is therefore "<u>image data</u>."

Nothing in the specification or the claims supports inputting <u>any</u> types of data to the interpreter, devoid of some correlation to images from the camera. Instead, the specification and claims describe a system that receives a camera image, and subsequently analyzes/compares "image data" received from the camera. Defendants' proposed definition would allow for <u>any</u> data to be received from the camera, as long as such data is "digital" data related to an image, as set forth in Claim 1. Data is not "image data" when there is no relationship between the "data" and an image. Plaintiff's definition for "image data" divorces an image and its data, and effectively reads the word "image" out of the claim. Plaintiff's proposed interpretation is improper and should be rejected.

C.      "Reference Memory"

| |
|---|
| **Defendants' Proposed Construction**:   storage of reference image data from the camera |
| **Plaintiff's Proposed Construction**:   hardware for the storage and retrieval of data, which data may be used for comparisons |

Where are the "reference image data" coming from if not the camera? In its most basic form, the monitoring system of claim 1 includes five elements; a camera, an interpreter, a reference memory, a comparator, and an output interface. There is no additional source of "reference image data." The specification supports Defendants' construction that the camera supplies reference image data.

21

| 1:44-45 | An interpreter receives image data from the camera, and a reference memory stores reference image data. |
| 1:55-57 | "...and the interpreter is connected for storing image data from the camera in the reference memory..." |
| 2:10-12 | "The reference memory is adapted for storing image data for plural images..." |
| 3:55-57 | "For example, the user can instruct the interpreter 16 to identify and store in the reference memory 20 a pixel representation..." |
| 4:2-6 | "For example, the stationary objects can be identified at the same time every day, or when a person whose image data is in the reference memory appears in the space with a new person, the new person's image data is stored in the reference memory. |

Finally, the word "hardware" never occurs in the '669 patent. Accordingly, the Court should

construe "reference memory" as, "storage of reference image data from the camera."

D.    "Reference Image Data"

| **Defendants' Proposed Construction**:   image data which has been stored in the reference memory |
| **Plaintiff's Proposed Construction**:   data used for comparisons, and can include license plate numbers or other types of data |

The phrase "reference image data" appears once in asserted Claim 1. But the claim element

that immediately follows the phrase "reference image data" (i.e. "comparator") establishes that it

should not be distinguished from the definition for image data. In the "comparator" element, the

claim requires that "image data from the interpreter" be compared "to image data from the reference

memory." If, as Plaintiff suggests, "reference image data" is distinct from "image data," what data

comprises the "image data from the reference memory?" Again, Plaintiff's definition writes the

"image" limitation out of the claim, and is not an accurate embodiment of the claim term.

There is not a single statement in the patent to shed light on any meaning for the term

"reference image data" beyond Defendants' suggested meaning. The only mention of the phrase

"reference image data" is in two claims and once in the summary of the invention ('669 Patent 1:43-

45), but these limited instances do not support the notion that "reference image data" is separate and

distinct from "image data." The context of the two claim elements make clear that "reference image data" is simply image data that has been stored in the reference memory, and should be construed as such.

E.     "Interpreter"

| | |
|---|---|
| **Defendants' Proposed Construction**: receives and selects digital image data from the camera | |
| **Plaintiff's Proposed Construction**: a microcomputer and/or associated software that selects data from the camera | |

Defendants include "digital image" in their construction, because Plaintiff repeatedly sought to distinguish his claimed device from the prior art on the basis of their device's use of a digital camera that directly outputs digital image data and an interpreter that receive that digital image data. As examined above, Plaintiff is estopped by prosecution history disclaimer from arguing otherwise in litigation.

Plaintiff, in his brief, specifically notes the '669 patent at 3:28-29 indicating that the interpreter, "selects <u>image</u> data from the cameras." (Underline added). However, yet again, Plaintiff omits "image" from his definition. If Plaintiff contends, "image data" = "data" why is the word "image" used to modify "data" in the claims and throughout the specification? This is simply illogical. Here are four (of many) examples where the interpreter is described/defined using "image data" or "images," (underline has been added):

| 1:42-44 | "An interpreter receives image data from the camera, and a reference memory stores reference <u>image data</u>." |
|---|---|
| 3:27-30 | "The cameras are connected to input image data to an interpreter 16. The interpreter 16 selects <u>image data</u> from the cameras 12, 13 according to analysis criteria input from a programmer 18." |
| 3:58-60 | "The interpreter 16 identifies the object <u>images</u> meeting the programmed criteria, and stores the <u>images</u> in the reference memory 20." |
| 4:20-23 | "<u>Image data</u> from the interpreter and the reference memory are compared by the comparator 22 according to the comparison criteria to determine correlation of the images." |

Based on Plaintiff's consistent and unambiguous definition of "interpreter" that is present in the specification, and Plaintiff's admissions in the Reexamination proceeding "interpreter" should be construed to mean "receives and selects digital image data from the camera."

F.     "Comparator"

| |
|---|
| **Defendants' Proposed Construction**:   determines a correlation between pixels from the reference image data and pixels from the image data |
| **Plaintiff's Proposed Construction**:    a microcomputer and/or associated software that compares the image data from the interpreter to the reference image data |

The '669 Patent's specification does indeed support a definition of "comparator" restricted to pixel-to-pixel correlation. Plaintiff argues that numbers can be compared to numbers to identify license plates, writing, "However, the comparator is not limited to just determining a correlation between pixels; the comparator more generally compares 'image data from the interpreter and the reference memory.' (4:20-23). For example, the comparator can compare a detected license plate number to a license plate number in reference memory (5:1-6)." Plaintiff conveniently omits the specification language immediately preceding 5:1-6, which reads, "Analysis is limited to consistently sized characters within a specified boundary, that is the rectangular shape of the license plate. When the object 32 meets the analysis criteria of a license plate, the number is compared to the numbers in reference memory." ('669 Patent 4:66-67 - 5:1.) Without a pixel-to-pixel comparison how are the consistently sized characters determined?   How is the rectangular shape determined?   The specification describes how the comparator and interpreter determines correlation of image data on a pixel-to-pixel basis at the following locations (underline added):

| | |
|---|---|
| 3:38-40 | "The comparator 22 determines a correlation between <u>pixels</u> from the reference memory 20 and <u>pixels</u> from the interpreter 16." |
| 3:55-58 | "For example, the user can instruct the interpreter 16 to identify and store in the reference memory 20 a <u>pixel</u> representation of all stationary objects on a shelf in the space 14 at a selected time." |
| 4:32-36 | "For example, a person's hand would be an acceptable stationary pattern, but a <u>pixel</u> |

| | pattern representing sudden movement of the hand, such as striking something, would represent an impermissible event causing an alarm." |
|---|---|
| 5:8-10 | "The license plate example utilizes a high degree of correlation between the reference image and the monitored image." |
| 5:27-30 | "…by allowing a pixel comparisons to vary within a range…" |

As illustrated above the specification describes how image data comparisons are made on pixel-to-pixel basis. Accordingly, "Comparator" should be construed as, "determines a correlation between pixels from the reference image data and pixels from the image data."

G.    "Monitoring System"

**Defendants' Proposed Construction**:  system for monitoring a space comprising a camera adapted for receiving images of a space to be monitored; an interpreter adapted for storing in the reference memory image data from the camera; a comparator connected to the interpreter for comparing image data from the interpreter to image data from the reference memory; and an output interface reporting results of the image data comparisons preformed by the comparator.

**Plaintiff's Proposed Construction**:   a system for observing, recording, and/or analyzing the characteristics of a subject

Attempting to interpret Claim 1 in light of the first paragraph of the Summary of the Invention (1:40-50) is how Defendants arrived at their proposed construction.  Plaintiff's definition of "monitoring system" is so broad that a night watchman with a whistle and clipboard could fall under their construction.

A court first looks to the claims themselves to define the scope of an invention. *Vitronics*, 90 F.3d at 1582.  The patentee is presumed to have intended every word chosen for use in a claim to have specific function in adding to the meaning of that claim. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004).  Second, a court looks to the specification to determine if the terms are defined, either expressly or by implication. *Vitronics*, 90 F.3d at 1582.  "Monitoring System" is expressly defined at 1:40-50 as, "The present invention provides a monitoring system having a camera adapted for receiving images of a space to be monitored. An interpreter receives image data from the camera, and a reference memory stores

25

reference image data. A comparator is connected for comparing image data from the interpreter to image data from the reference memory according to selected comparison criteria.  An output interface reports results of the image data comparisons performed by the comparator." Defendants' proposed construction comports with this language, and as such the Court should adopt Defendants' definition.

H.    "Movably Mounted"

| **Defendants' Proposed Construction**:  mounted to a movable support |
|---|
| **Plaintiff's Proposed Construction**:   a camera that is fastened or affixed to a support that can be moved from one place to another and that can monitor a space while it is moving or being moved |

Nothing in the claims requires that the camera be mounted on a moving mount.  Instead, they simply require the camera be movably mounted. The specification does not contain the phrase "moveably mounted," but instead reads, "The camera is mounted to a movable support, such as a vehicle, and the space to be monitored changes according to movement of the support. Alternatively, the camera is mounted to a stationary support." ('699 Patent 2:15-18) In this instance the mount is either movable or stationary. The camera on the mount does not move, only the mount moves.

There is nothing in the claims that restrict the term "movably mounted camera" to only embodiments where the camera is moving during operation.  The term encompasses a camera that can move or be moved, irrespective of whether the monitoring system is in operation.   The prosecution history supports Defendant's position. The original claims of the '669 Patent included claims directed to a "movably mounted" camera, as well as to a camera mounted to either a "movable support" or a "stationary support."  Exhibit G, Patent Application - Claims 7, 16 and 17. In the response to an office action dated April 14, 1997 (Exhibit F), Applicant/Plaintiff amended the claims such that all pending system claims included the claim limitation "movably mounted camera." In the remarks accompanying this amendment, Applicant/Plaintiff made it clear that the term

"movably mounted" could encompass a movable support or a movable mount: "[a]lthough it is well known to mount a camera on a movable support or movably mount a camera on a stationary support, there is no suggestion in the art to do so in combination with the system shown in Pomerleau." Applicant then went on to discuss several embodiments meeting the "movably mounted camera" limitation.

Plaintiff's proposed construction should be rejected, and "movably mounted" should be construed to mean, "mounted to a movable support."

     I.     "Output Interface"

| |
|---|
| **Defendants' Proposed Construction**:   reports results of the image data comparisons |
| **Plaintiff's Proposed Construction**:   hardware that advises a user of the results of comparisons. |

Defendants did indeed provide a proposed definition of "output interface" on page 6 of Exhibit B filed with the Joint Claim Construction and Prehearing Statement (PLR 4-3), and are unclear why Plaintiff contends otherwise.

The word "hardware" never occurs in the '669 patent. Plaintiff proposed definition is "hardware that advises..." However, Plaintiff then offers a definition that defines "interface" as "[s]oftware that enables..." Is the "output interface" hardware or software? Neither hardware nor software is supported by the intrinsic evidence, nor is Plaintiff's support of his proposed definition logically consistent. Defendants believe Plaintiff is trying to capture the definition of "output device" instead of "output interface." These terms are not synonymous.

"An output interface reports results of the image data comparisons performed by the comparator." (1:47-49) Accordingly, "Output Interface" should be construed to mean "reports results of the image data comparisons."

J.    "Record Memory"

| **Defendants' Proposed Construction**: There is no "record memory" in Claim 1; thus, Claim 8 lacks proper antecedent basis per 35 U.S.C. 112. However, Defendants offer the following definition: connected for storing image data from the output interface |
| --- |
| **Plaintiff's Proposed Construction**:   hardware that can retain data. |

Plaintiff in his brief contends "The specification clearly sets out the meaning of 'record memory' as a component of the monitoring system that is 'adapted for storing information associated with the image data' and 'for storing image data from the output interface.'" Defendants agree. Defendants are not analyzing anything in a vacuum, but instead actually using the same words used in the specification for their definition. The word "hardware" never occurs in the '669 Patent. Plaintiff attempts again to omit the word "image" from his definition although every occurrence of "record memory" in the '669 patent specifically discuss "image data." ('669 Patent 1:65-67, 3:44-45, 4:41-45) Accordingly, the Court should construe "record memory" to mean "connected for storing image data from the output interface."

While Defendants have offered the aforementioned construction, they continue to believe there is a lack of clarity in claim 8, since there is no mention of "record memory" in claim 1, which renders the claim indefinite per 35 U.S.C 112.

CONCLUSION

As detailed herein, Plaintiff's proposed definitions are simply the product of its desire to rewrite the claims to cover the defendant's system.  If the claims are interpreted by their plain and ordinary meaning, there is no infringement.  Alternatively, if the system claimed by Plaintiff were drafted to eliminate all instances of "image" and compare data rather than image data, and were not held to digital modes, Plaintiff's patents may cover Defendant's system but would undoubtedly also cover technology invented decades ago.  Such broad claim scope is not what is expressed in the

specification, the prosecution history or the claims.

It is clear that the prosecution history and prosecutorial estoppel play a large role in the claim construction at hand. Defendants would again draw the Court's attention to this issue. Fifteen months after *Markman* claim construction hearings became Federal Circuit law, *Vitronics Corp. v. Conceptronic Inc.*, 90 F.3d 1576, (Fed. Cir. 1996) released its seminal opinion regarding The Use of Intrinsic and Extrinsic Evidence in Claim Construction. Therein at pages 1582 – 1583 the court proffered three statements regarding the weight of the prosecution history that bear the Court's attention.

> "It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history. See *Markman*, 52 F.3d at 979, 34 USPQ2d at 1329. Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language."

> "This history contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims. As such, the record before the Patent and Trademark Office is often of critical significance in determining the meaning of the claims. See *Markman*, 52 F.3d at 980, 34 USPQ2d at 1330; *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576, 34 USPQ2d 1673, 1676 (Fed.Cir.1995) ('The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.') (citations omitted)"

> "The claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely. In other words, competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention. See *Markman*, 52 F.3d at 978-79, 34 USPQ2d at 1329."

Allowing the public record to be altered or changed by extrinsic evidence introduced at trial, such as expert testimony, would make this right meaningless. See *Southwall*, 54 F.3d at 1578: ("A patentee may not proffer an interpretation for the purposes of litigation that would alter the indisputable public record consisting of the claims, the specification and the prosecution history, and

treat the claims as a 'nose of wax.' " (quoting *Senmed, Inc. v. Richard-Allan Med. Indus., Inc.*, 888 F.2d 815, 819 n. 8 (Fed.Cir.1989)).  The same holds true whether it is the patentee or the alleged infringer who seeks to alter the scope of the claims.

It impermissible under the law for the Plaintiff to contort the claim terms to broaden claim scope to cast a larger net for alleged infringers while at the same time to narrow the claim scope to avoid invalidating prior art.  For each of the contested terms, the Defendants have offered the Court plain and ordinary meanings that are true to the claims and intrinsic evidence and respectfully request that they be accepted.

                              Respectfully submitted,

Dated:  February 27, 2012    By:      /s/ Mark S. Hubert
                                  MARK S. HUBERT, PC
                                  Mark S. Hubert, *pro hac vice*
                                  MarkHubert@pacifier.com
                                  2300 SW First, Suite 101
                                  Portland, OR 97201
                                  Telephone: 503-234-7711
                                  Facsimile: 503-224-0092

                                  **THOMPSON BOGRAN, PC**
                                  Roy B. Thompson, *pro hac vice*
                                  Amy M. Bográn, *pro hac vice*
                                  RoyThompson@comcast.net
                                  15938 SW Quarry Rd., Suite B-6
                                  Lake Oswego, OR 97035
                                  Telephone: 503-245-6600
                                  Facsimile: 503-244-8399
                                       *Counsel for Defendants Vigilant Video, Inc. and*
                                       *The City of Port Arthur, Texas*

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2012, the foregoing was submitted for filing to the Clerk of the District Court by using CM/ECF, which will send a Notice of Electronic Filing to all counsel of record who are deemed to have consented to electronic service as per Local Rule CV-5(a)(3). Any other counsel of record as well as Brian M. Buroker (Appointed Technical Advisor) at Gibson Dunn & Crutcher LLP, 1050 Connecticut Ave. NW, Washington, DC  20036-5306 will be served by electronic mail, facsimile transmission and/or first class mail on this same date.

/s/ Roy B. Thompson
Roy B. Thompson, *pro hac vice*
RoyThompson@comcast.net
15938 SW Quarry Rd., Suite B-6
Lake Oswego, OR 97035
Telephone: 503-245-6600
Facsimile: 503-244-8399

*Counsel for Defendants*
*Vigilant Video, Inc. and*
*The City of Port Arthur, Texas*

CERTIFICATE OF SERVICE