# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| JOHN B. ADRAIN, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 2:10-CV-173-JRG |
| | § | |
| VIGILANT VIDEO, INC., et al., | § | |
| | § | |
| *Defendants*. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the construction of the parties' disputed claim terms, which the Court previously addressed in its April 19, 2012 Preliminary *Markman* Order. (Dkt. No. 97.) That Preliminary Order is superseded by this expanded claim construction order; and this Order is and shall be effective as of April 19, 2012. The Court will first briefly address the patent-in-suit and then turn to the merits of the claim construction issues.

## I.  BACKGROUND AND THE PATENT-IN-SUIT

On May 26, 2010, John D. Adrain brought suit against The City of Port Arthur, Texas and Vigilant Video, Inc. alleging infringement of U.S. patent No. 5,831,669 (the "'669 patent" or "Adrain patent"). In general, the Adrain patent discloses a system for monitoring a space with a movably mounted camera, receiving images from the camera, and comparing those images to previously stored images to generate an output.

According to the '669 patent:

> Video cameras are used for monitoring activity in myriad locations and applications. Commonly, a person views a display showing a scene viewed by the cameras. A single display might receive input from several cameras or each camera might have a dedicated display. Frequently, the person is responsible for monitoring several displays, in addition to other responsibilities. The person

cannot give undivided attention to each monitor.  Even if the person is responsible only for monitoring a single display, fatigue, boredom, hypnosis, or other factors can cause the person to miss events shown on the display.

'669 patent at 12-22.

Plaintiff alleges in its complaint that the '669 patent overcomes these problems by providing a monitoring system with five elements: a movably mounted camera, an interpreter, a reference memory, a comparator and an output interface.  Through these elements, the monitoring system of claim 1 of the '669 patent has application in numerous situations where video or human monitoring is presently utilized or where video and other forms of monitoring have been ineffective.  '669 patent at 60-64.

## II.    LEGAL PRINCIPLES

### A.    Claim Construction Principles

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention."  *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999).  Claim construction is an issue of law for the court to decide.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history.  *Markman*, 52 F.3d at 979.  The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention.  *Id.*  A patent's claims must be read in view of the specification, of which they are a part.  *Id*.  For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims.  *Id*.  "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims."  *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's invention. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp*. of Am., 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This Court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the <u>claims</u> of a patent define the invention to which the patentee is entitled the right to exclude." 415 F.3d at 1312 (emphasis added) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id*. The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id*. at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to and intended to be read by others skilled in the particular art. *Id*.

Despite the importance of claim terms, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*. Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id*. at 1315 (quoting *Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id*. at 1314-17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316. Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the Patent and Trademark Office ("PTO") understood the patent. *Id.* at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id*.

Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Phillips*, 415 F.3d at 1319-24. The approach suggested by *Texas Digital*—the assignment of a limited role to the specification—was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id.* at 1320-21. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id.* What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id.* The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id.* at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers

disputed claim language. *Id*. at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

## III.    CONSTURCTION OF AGREED TERMS

The parties have agreed to the construction of the following terms:

| Claim Term/Phrase/Clause: Claim No(s). | Agreed Definition |
|---|---|
| Programmer (claim 2) | A microcomputer and/or associated software used to input criteria, such as comparison criteria, analysis criteria, and the utilization criteria. |
| Analysis criterion (claim 3) | Rules use by the interpreter for the selection of image data. |
| Utilization criteria (claim 6) | Rules used by the comparator and/or output interface for reporting results of comparisons. |
| Cooperate (claim 1) | Work together. |
| Comparing image data (claim 1) | Determining the similarities and differences between the image data from the interpreter image data from the referenced memory. |
| Image data from the reference memory (claim 1) | No construction necessary |
| Image data comparisons (claim 1) | No construction necessary |
| Comparison criterion (claim 1) | Rules used by the comparator for the comparison of data. |
| Image portions (claim 1) | No construction necessary. |
| Space to be monitored (claim 1) | Area that is imaged by the movably mounted camera, which area can change according to movements of the movable support. |

(*See* Dkt. No. 76, and Dkt. No. 77). In view of the parties' agreements on the proper construction of each of the identified terms, the Court **ADOPTS** the parties' agreed-upon constructions. These agreed-upon constructions shall apply and govern in this case.

## III.  CONSTRUCTION OF DISPUTED TERMS

### A.  Camera

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction needed | A digital camera that directly outputs digital image data |

### 1.  The Parties' Positions

Plaintiff proposes that "camera" does not require construction.  It proposes that the term is a commonly understood word and that Defendants improperly attempt to require the camera to be digital comes from the ongoing reexamination.  That reexamination, it contends, is still ongoing and may result in the claims changing further from the current revisions that added the word "digital" to describe the camera in the reexamination.

Defendants, in response, argue that the Court should construe "camera" to mean a "digital camera that directly output digital image data."   Defendants argue that Plaintiff has amended claim 1 in reexamination to require that the camera is digital to overcome prior art being applied there.  Defendants assert that Plaintiff argued to the PTO in the reexamination, that the digital camera directly outputs digital output data.  They argue that the reexamination prosecution history estops Plaintiff from arguing that its invention should cover an analog camera or anything other than a digital camera.

In reply, Plaintiff notes that the word "digital" does not appear anywhere in claim 1 of the '669 patent as it was issued.  It argues that the PTO has not yet allowed the amendment to claim 1 to limit the claims of the '669 patent during reexamination to a digital camera.  If, they note, camera already meant "digital camera," then it argues that it would not need to amend the claims in reexamination to expressly add the word "digital" to "camera."

Thus, the dispute here focuses on whether or not the term camera in claim 1 of the '669 patent must be a digital camera or not.

### 2. Discussion

The claim term "camera" appears, in representative form, in Claim 1 of the '669 Patent:

1. A monitoring system comprising:

a movably mounted camera adapted for receiving images of a space to be monitored;

an interpreter for receiving image data from the camera;

a reference memory for storing reference image data;

a comparator connected for comparing image data from the interpreter to image data from the reference memory according to selected comparison criteria, wherein the interpreter and comparator cooperate to select recognizable portions of image data among unrecognized portions of image data in the space being monitored, the selected image portions being compared to the image data in the reference memory; and

an output interface for reporting results of the image data comparisons performed by the comparator.

In urging that the term "camera" should be interpreted to be a digital camera, Defendant relies heavily on prosecution history in the ongoing reexamination of the '669 patent. Specifically, currently before the PTO in the ongoing reexamination, Plaintiff has submitted a proposed amendment to claim 1 that would limit the camera to a "digital camera." *See* D.I. 77, Ex. D at 2 (proposing to amend the first clause of claim 1 to be "a movably mounted <u>digital</u> camera adapted for receiving images of a space to be monitored for <u>directly outputting digital image data</u>" with the underline representing proposed new language). Plaintiff argues that this court should not consider the reexamination file history because those proposed amendments have not been accepted by the PTO and are not technically part of claim 1 of the '669 patent at issue currently in this case.

This Court is obligated to interpret the operative language of claim 1 of the '669 patent, which does not currently specify that the camera in claim 1 is a "digital camera" or that the camera "directly output[s] digital image data." As Plaintiff notes, until the reexamination process is complete, Plaintiff has the ability to withdraw the proposed amendments. And, until a reexamination certificate issues, any proposed amended claims are not part of the '699 patent claims. Moreover, the comments cited in the reexamination file history relate only to the amended claims that include the word digital – not the original claims. Thus, those comments are not relevant to this Court's analysis of the originally issued claim term "camera." The language of the claims that this Court is obligated to interpret is that included in the patent as it issued on November 3, 1998.

Defendants fail to cite any portion of the '669 patent specification or the original file history of the '669 patent that compels limiting "camera" to a digital camera. Instead, the '669 patent specification states that the camera can be "a digital video camera translating visible images into digital electric signals" or that "other cameras are also suitable, such as analog or infrared." '669 Patent at 3:18-21. Because, the patent specification contemplates the camera being digital, analog or infrared and there is no clear attempt to exclude one of those embodiments in the claims or the original prosecution history, this Court declines to limit camera to the digital camera embodiment.

**In conclusion, the Court finds that the term "camera" should be given its plain and ordinary meaning.**

## B. Movably Mounted

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a camera that is fastened or affixed to a support that can be moved from one place to another and that can monitor a space while it is moving or being moved" | "mounted to a movable support" |

### 1. The Parties' Positions

Plaintiff argues that the Court should construe the term "movably mounted" to mean "a camera that is fastened or affixed to a support that can be moved from one place to another and that can monitor a space while it is moving or being moved." Defendants, on the other hand, argue that the Court should construe the phrase movably mounted to mean "mounted to a movable support." The primary dispute between the parties appears to focus on whether both the camera and the support can move or whether only the support must be movable. Plaintiff argues that the term "movably mounted" means that both the camera and the support can move. Plaintiff cites to the patent specification example at column 4, lines 63 to 64 where the camera is mounted on a police car in which the camera moves relative to the ground.

Defendants argue that nothing in the claims requires that both the mount and camera move. Instead, Defendants argue there is nothing that restricts the claims to embodiments where the camera is moving during operation. As a result, Defendants urge that this Court reject the broader scope suggested by Plaintiff and define "movably mounted" to mean "mounted to a movable support."

### 2. Discussion

The term "movably mounted" appears in Claims 1 of the '669 patent. The specific phrase "movably mounted" does not appear in the specification of the '669 patent other than in original application claim 7. Application claim 8 (which became '669 patent claim 7) depended

from application claim 7 and recited that the camera was mounted on a vehicle. So, "movably mounted" must be broad enough to cover a camera that is mounted on a moving object, like a vehicle. The specification of the '669 patent provides at least one example in which the camera moves relative to ground by being mounted on a vehicle. '669 Patent at 4:63-64. The specification of the '669 patent also provides at least one example in which the camera is mounted on a stationary support, such as a wall of a space to be monitored. *Id.* at 3:16-18.

Plaintiff's proposal describes not just a physical arrangement of the camera, but also a description of when the camera operates through the phrase: "[The camera] can monitor a space while it is moving or being moved." That phrase, however, would mean that one of the embodiments of the patent – a camera that is affixed to a stationary object – would be excluded. Without some indication of an express intention to exclude an embodiment, this Court declines to adopt that portion of Plaintiff's proposed interpretation.

Defendant's proposal, on the other hand, appears to limit the claim to the stationary embodiment, to the exclusion of the embodiment in which the camera is mounted on a moving object, such as a vehicle. Specifically, by proposing to limit claim 1 to a camera that is "mounted to a movable support," Defendants' proposal might be limited to only an embodiment in which a camera is mounted on a stationary object, such as a wall, and only movable relative to the object (*e.g.*, rotated about an axis to monitor the space from that stationary object's location). The Court finds no basis in the specification for limiting the term "movably mounted" to exclude an embodiment in the specification.

Further, during prosecution, Plaintiff informed the PTO that "[a]lthough it is well known to mount a camera on a movable support or movably mount a camera on a stationary support, there is no suggestion in the art to do so in combination with the system shown in Pomerleau

[one of the prior art references being applied]." D.I. 77, Ex. F at 5. Therefore, to comport with the specification and the file history, a proper interpretation of this claim should cover both embodiments described. *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) ("We normally do not interpret claim terms in a way that excludes disclosed examples in the specification."); *see also MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct.").

**In conclusion, the Court construes the term "movably mounted" to be "fastened or affixed to a support such that the camera can be moved in any of the following ways:**

    a. **the camera moves and the support remains stationary,**
    b. **the support moves and the camera remains stationary, or**
    c. **both the camera and the support move."**

**C.     Image data**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "data that is input to the interpreter, including data representative of a license plate number or other types of data" | "digital data related to an image taken from a camera" |

**1.     The Parties' Positions**

Plaintiff contends that the phrase "image data" should be interpreted to mean "data that is input to the interpreter, including data representative of a license plate number, or other types of data." Plaintiff argues that the term has a broader meaning than that urged by Defendants because it can cover applications including thermal imaging or Micropower Impulse Radar for monitoring through opaque materials. Specifically, Plaintiff argues, the '669 patent specification states that the data can consist of license plate numbers. It further says that the "image data" is

specified as being input into the interpreter. Plaintiff opposes Defendants' interpretation because it says that it reads out a preferred embodiment – namely, the analysis of data other than visual images.

In response, Defendants contend that the phrase "image data" should be interpreted to mean "digital data related to an image taken from the camera." Defendants argue that any definition must focus on the term "image" that Plaintiff selected to modify the word "data." The term image is repeatedly used in the patent specification and claims to describe the data used in the invention according to Defendants. Plaintiff's interpretation, Defendants argue, is not limited to images at all and would encompass any type of data. Defendants argue that the other examples Plaintiff cites that relate to thermal imaging and Micropower Impulse Radar are not "images" at all. While Plaintiff may have disclosed other types of data that its system might analyze, it limited its claims to images, according to Defendants' argument. Defendants then argue that if Plaintiff wanted to include all of the embodiments, it should not have used the term "image data." Defendants also argue that the license plate example is still an example in which digital images are compared as opposed to an alphanumeric character string comparison. Defendants point to statements made in the ongoing reexamination in support.

In reply, Plaintiff argues that the other examples are examples of image data being processed. It further points again to the example in the specification in which a license plate "number is compared to the numbers in the reference memory." '669 Patent at 5:2-3.

Thus, there are two significant differences between these two proposed interpretations. First, Defendants' construction would require the data to be digital. Second, Plaintiff's construction includes an example that the data is representative of a license plate, or other types of data.

## 2.     Discussion

Defendants' argument that the image data must be digital again relies heavily on prosecution history statements made by Plaintiff in the ongoing reexamination. Claim 1 of the '669 patent as issued does not specify that the image data is digital and, therefore, the Court declines to require that the data be digital.

Plaintiff's proposed interpretation specifies where the data is provided ("input to the interpreter") and gives a specific example of what it includes ("including data representative of a license plate number, or other types of data"). First, the express language of claim 1 already specifies that the "image data" is received by the interpreter from the camera ("an interpreter for receiving image data from the camera"). It is not necessary to include in an interpretation language which is already expressly present in claim 1. The jury will be provided claim 1 in its entirety, including the requirement that the image data is input to the interpreter.

Second, while examples are sometimes helpful, in this case, Plaintiff's proposal of "data representative of a license plate number" is too broad and would add an example from the specification into the claims. *See Anderson Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1373 (Fed. Cir. 2007) ("We have warned against importing limitations from the specification into the claims absent a clear disclaimer of claim scope.") (citing *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1375 (Fed. Cir. 2005)). Plaintiff's interpretation is also too broad because it does not specify that the license plate number has any relationship to an "image." And, the addition of the phrase "other types of data" would render the interpretation even broader. Plaintiff's proposal would appear to cover data with no connection whatsoever to an image. The examples it provides – thermal imaging and Microwave Power Radar – still relate to an image, just not a visual image. To be "image data," the data must have some connection to an image.

**Therefore, this Court construes the "image data" to be "data related to an image."**

### D. Reference image data

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "data used for comparisons, and can include license plate numbers or other types of data" | "image data which has been stored in the reference memory" |

### 1. The Parties' Positions

Plaintiff contends that the term "reference image data" should mean "data used for comparisons, and can include license plate numbers or other types of data." Defendants content that the term "reference image data" should mean "image data which has been stored in the reference memory." Essentially, Plaintiff's proposal is identical to its proposal for the term "image data" except that it specifies that reference image data is "used for comparisons." Defendants propose taking the base term "image data" and specifying further that it "has been stored in the reference memory." As such, Defendants' proposal defines the image data in terms of where it is stored and Plaintiff's proposal defines it in terms of how it is used.

### 2. Discussion

Defendants' proposal to define "reference image data" based on its location would add an unnecessary limitation into the claims. Claim 1 already defines where the reference image data is stored – namely, in the reference memory. '669 patent claim 1 ("a reference memory for storing reference image data").

Plaintiff's proposed interpretation interprets the term "reference image data" in terms of how it is used, namely, for comparison. Specifically, claim 1 specifies in the "comparator" limitation that "the selected image portions being compared to the image data in the reference memory."

**The Court construes "reference image data" to be "data related to an image that is used as a reference for comparison."**

### E. Reference Memory

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "hardware for the storage and retrieval of data, which data may be used for comparisons" | "storage of reference image data from the camera" |

### 1. The Parties' Positions

Plaintiff argues that the "reference memory" should be interpreted to mean "hardware for the storage and retrieval of data, which data may be used for comparisons." Plaintiff argues that any data may be stored in the reference memory, such as license numbers for stolen cars, data obtained from the camera of the system, as well as a pixel representation of all stationary objects on a shelf in the space at a selected time, citing to '669 Patent at 4:65-66, 3:33-34, 3:39-50, and 3:57-58. Plaintiff argues that data is retrieved from the reference memory to be used for comparisons. Plaintiff argues that Defendants' proposed interpretation would exclude embodiments from the specification because their proposal is limited to storage of image data from the camera. Plaintiff argues that the specification provides examples in which the reference memory stores license plate numbers and other types of data.

Defendants respond that the term "hardware" does not appear anywhere in the '669 patent specification so it should not appear in the claim interpretation. Defendants argue that the reference image data must come from the camera recited in claim 1 and cites the specification in which the camera is a source of image data to the reference memory, citing '669 patent at 1:55-57.

Plaintiff responds in reply that the patent specification does not indicate that the reference image data must come from the camera. Instead, Plaintiff argues that the patent specification provides an example in which the reference image data comes from the interpreter. '669 patent at 3:33-35.

Thus, the dispute here centers on whether the reference image data must come from the camera and how to describe what the memory is (hardware versus storage).

### 2. Discussion

The first dispute that needs to be resolved is whether to describe the reference image memory as hardware or storage. Defendants accurately point out that the '669 patent specification does not use the word hardware. And, the figures only show reference memory 20 as a block in a block diagram, suggesting it could be hardware, software or a combination of both. On the other hand, the word "storage" might encompass something rudimentary like a box or a closet when the '669 patent is clearly talking about a device that holds data. Accordingly, this Court finds that the term "data storage" is appropriate given the rest of the language of claim 1 that specifies that the reference memory stores reference image "data."

Second, the parties dispute whether the data stored in the reference memory must come from the camera recited in claim 1. Claim 1 does not recite that the reference image data must come from the camera, as discussed above in section III.D.

**The Court construes "reference memory" to be "data storage that stores data related to an image that is used as a reference for comparison."**

### F.     Interpreter

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a microcomputer and/or associated software that selects data from the camera" | "receives and selects digital image data from the camera" |

### 1.     The Parties' Positions

Plaintiff argues that the "interpreter" of claim 1 should be interpreted to be "a microcomputer and/or associated software that selects data from the camera."  Plaintiff cites the specification where the interpreter is integrated "in a microcomputer and associated software," citing '669 patent at 3:28-29.  Plaintiff again argues that the term "digital" need not be incorporated into this claim term either.

Defendants argue that the only data selected by the interpreter is image data from the camera and thus, Plaintiff's interpretation that does not specify that the data is "image data" should be rejected.  Defendants also cite to the reexamination history again for their argument that the term must be limited to digital image data.

In reply, Plaintiff argues that the specification gives examples of the interpreter receiving data that is not image data and again asserts that the reexamination history should not be used to require that the interpreter to select "digital" image data.

The dispute here focuses on how to describe the interpreter (Plaintiff using the noun-based phrase "a microcomputer and/or associated software" vs. the Defendants using the verbs "receives and selects") and whether this term must select digital image data, image data or just data.

### 2.     Discussion

As to the first dispute, claim 1 is a system claim and, therefore, each of the elements must be a system element.  Defendants' interpretation, however, would substitute a noun – interpreter

– with two verbs that describe what Defendants contend that the element does – "receives and selects." This Court believes that defining a noun by using two verbs could create confusion among the jury in this case. In contrast, Plaintiff's proposal is based on express language from the patent specification. Namely, the specification states that "[p]referably, the interpreter 16, programmer 18, reference memory 20, comparator 22, and output interface 24 are integrated in a microcomputer and associated software." '669 patent at 3:49-52. However, the Court believes that constraining the interpreter to only a "microcomputer and/or associated software" is too limiting. The recited "microcomputer and associated software" relates to a preferred embodiment only, and the specification, when taken as a whole, indicates that the interpreter could be any type of hardware and/or software. Therefore, the Court modifies the Plaintiff's suggestion and defines the interpreter as "hardware and/or software."

As for the other disputes, noted above, this Court declines to limit this element to selecting digital image data based on the reexamination history that is not yet complete. On the next issue, the plain language of claim 1 requires that the interpreter receive image data from the camera – not just any data, contrary to Plaintiff's suggestion. *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) ("We normally do not interpret claim terms in a way that excludes disclosed examples in the specification."); *see also MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct.").

Finally, both parties appear to agree that the interpreter selects data from the camera, and, therefore, the Court will incorporate that into the final construction as well. Further, the language of the claim requires that the interpreter "receive[s] image data from the camera."

**Therefore, the Court construes "interpreter" to be "hardware and/or software that receives and selects image data from the camera."**

### G.    Comparator

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a microcomputer and/or associated software that compares the image data from the interpreter to the reference image data" | "determines a correlation between pixels from the reference image data and pixels from the image data" |

#### 1.    The Parties' Positions

Plaintiff argues that the "comparator" of claim 1 should be interpreted to be "a microcomputer and/or associated software that compares the image data from the interpreter to the reference image data."  Plaintiff cites the specification where the comparator is described as being integrated "in a microcomputer and associated software," citing '669 patent at 3:28-29. Plaintiff also argues that a pixel-to-pixel correlation is not required because the '669 patent specification provides examples where license plate numbers are compared.

Defendants argue that the term "comparator" should be interpreted in terms of what it performs – determining a correlation.   Further, Defendants argue that the only type of comparison shown in the specification is a pixel-to-pixel correlation, citing '669 patent at 3:38-40, 3:55-58, 4:32-36, 5:8-10 and 5:27-30.   Defendants argue that even the license plate comparison example cited by Plaintiff ('669 patent at 4:66-5:1) must necessarily involve a pixel-to-pixel correlation.   Accordingly, Defendants argue that any interpretation must be limited to a pixel-to-pixel correlation.

In reply, Plaintiff argues that the license plate specification does not necessarily involve a pixel-to-pixel correlation.   Plaintiff argues that the specification describes the system for extracting license plate numbers from an image and comparing those numbers to previously

stored numbers – thus employing a number-to-number correlation. Accordingly, it argues that an interpretation that limits the claim to a pixel-to-pixel correlation would exclude one of the preferred embodiments.

### 2. Discussion

As to the first dispute, as with the "interpreter" claim element, this Court finds that the comparator must also be construed to be a noun. Also, as with the "interpreter" claim element, the Court modifies Plaintiff's suggestion and defines the comparator as "hardware and/or software."

As for the dispute between the parties as to whether the comparator must provide a pixel-to-pixel correlation, the '669 patent specification clearly describes a pixel by pixel correlation. But, the Federal Circuit has instructed us to avoid reading examples from the specification into the claims. *Electro Med. Sys., S.A. v. Cooper Life Scis, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994). Further, the '669 patent clearly describes the comparator comparing a license plate number to numbers in the reference memory. '669 patent at 4:66-5:1. If that example involves something other than a pixel-to-pixel comparison, then Defendants provide no basis for excluding that example from the scope of the claims. *Verizon Servs. Corp.*, 503 F.3d at 1305; *see also MBO Labs., Inc.,* 474 F.3d at 1333. As a result, this Court declines to read the pixel-to-pixel example from the specification into the claims.

**Therefore, the Court construes "comparator" to be "hardware and/or software that compares the image data from the interpreter to the reference image data."**

### H.    Monitoring System

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a system for observing, recording, and/or analyzing the characteristics of a subject" | "system for monitoring a space comprising a camera adapted for receiving images of a space to be monitored; an interpreter adapted for storing in the reference memory image data from the camera; a comparator connected to the interpreter for comparing image data from the interpreter to image data from the reference memory; and an output interface reporting results of the image data comparisons performed by the computer" |

### 1.    The Parties' Positions

Plaintiff argues for this term from the preamble of claim 1 to be construed to mean "a system for observing, recording, and/or analyzing the characteristics of a subject."    Plaintiff argues that the term monitoring system is well known and is used in claim 1 to introduce the system.  It further argues that if any interpretation is needed, then the Court should simply adopt the ordinary meaning of monitor, which it asserts to be "observing, recording and/or analyzing the characteristics of a subject."  Plaintiff further argues that Defendants' proposed interpretation paraphrases the entirety of claim 1, which is unnecessary because the jury will have all of claim 1 to review.  As a result, Plaintiff also argues that Defendants are trying to have this Court incorporate the claim interpretations of other terms at issue through the interpretation of "monitoring system."

Defendants argue that the monitoring system term should be interpreted based on the summary of the invention, which it says provides an express definition for "monitoring system." It also argues that Plaintiff's proposed interpretation is so broad that it would encompass a human being that is a night watchman with a clipboard.

In reply, Plaintiff notes that "monitoring system" must be interpreted in the context of claim 1, which provides a number of other limitations already.

### 2. Discussion

Defendants' proposed interpretation is based on common language in the summary of the invention that paraphrases one of the claims. The cited portion in the summary of the '669 patent (1:40-50) is not a definition of "monitoring system," but rather a description of the elements that may make up a monitoring system in one embodiment. Further, as Plaintiff argues, Defendants have incorporated interpretations of many elements into its proposal for "monitoring system" that this Court did not accept.

Plaintiff's proposed interpretation provides additional clarification for the jury and, in the context of the rest of claim 1, would not be read so broadly to encompass a night watchman with a clipboard as Defendants argue.

**Thus, this Court adopts the Plaintiff's proposed interpretation for "monitoring system" and construes it to be "a system for observing, recording, and/or analyzing the characteristics of a subject."**

### I. Output Interface

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "hardware that advises a user of the results of the comparisons" | "reports results of the image data comparisons" |

### 1. The Parties' Positions

Plaintiff argues that the "output interface" of claim 1 should be interpreted to be "hardware that advises a user of the results of the comparisons." Plaintiff cites the specification describing the output interface as the component of the monitoring system that advises the user

of the results of comparisons, citing '669 patent at 3:42-47, 1:47-49, 4:48-51, and 5:1-6. Plaintiff indicates that the inclusion of the term "hardware" in its proposed interpretation is based on the passage in the specification that says that the output interface is "preferably … integrated in a microcomputer and associated software." '669 patent at 3:49-51. Plaintiff also cites a dictionary definition for "interface" that is "software that enables a program to work with the user ... with another program … or with the computer's hardware," citing the Microsoft Computer Dictionary 241, 325 (4th ed. 1999).

Defendants argue that the word "hardware" does not appear in the '669 patent. They also note that despite Plaintiff's argument that the term should be interpreted as "hardware," the dictionary citation it provided describes an "interface" as software. Defendants then argue that neither "hardware" nor "software" is supported in the patent specification. Defendants point to a passage in the specification as the proposed definition. Namely, Defendants quote from column 1, lines 47-49 that states that "an output interface reports results of the image data comparisons performed by the comparator."

In reply, Plaintiff reiterates the language from the specification and indicates that its interpretation is not logically inconsistent.

This dispute focuses on how to describe the output interface (the noun "hardware" vs. the verb "reports") and whether it "advises a user" (Plaintiff) or "reports results" (Defendants).

## 2. Discussion

As to the first dispute, claim 1 is a system claim and therefore, each of the elements must be a system element. Plaintiff does not explain why, for the "output interface," it argues for an interpretation using the term "hardware" but for the interpreter and comparator elements it urged an interpretation that included "microcomputer and/or associated software" based on language in

the specification. Again, Defendants are correct that Plaintiff did not use the word hardware in the '669 patent specification to describe the "output interface" and the only extrinsic evidence it cites describes an "interface" as software – not hardware.

On the other hand, Defendants' proposed interpretation essentially is identical to the remaining words already present in claim 1. *Compare* claim 1 ("output interface for reporting results of the image data comparisons performed by the comparator"), *with* Defendants' proposal ("reports results of the image data comparisons"). It is unclear how rearranging the words in claim 1 will better assist the jury in understanding what the "output interface" means without indicating to the jury the kind of structure that may perform that action. As discussed above with respect to the "interpreter" and "comparator" elements, the Court declines to interpret a noun by using verbs as Defendants have proposed. Therefore, the Court believes that the straightforward noun "output" best defines "output interface."

As for the remaining dispute, Plaintiff urges the Court to include the concept of the "output interface" "advis[ing] a user" of the results of the comparisons based on its reading of examples in the '669 patent specification. While at least one example cited indicates that a user is notified of the results ('669 patent at 5:3-4 stating: "When the comparison finds a match, an appropriate alarm indicates discovery of a stolen car to officers in the police car."), other examples involve the results being shown on a monitor (which may or may have a user present at the time) ('669 patent at 4:48-51 stating: "When an alarm condition arises in one space, its output is sent to the monitor.") or to memory for later retrieval ('669 patent at 3:44-47 stating: "The output interface reports results of the comparison by selecting comparison data to be stored or otherwise utilized by a record memory or monitor.").

Because the '669 patent provides examples that suggest that the "output interface" advises a user and other examples that do not advise a user, Plaintiff's proposal would improperly exclude examples from the specification. *Verizon Servs. Corp.*, 503 F.3d at 1305; *see also MBO Labs.,* 474 F.3d at 1333.

**Therefore, the Court construes "output interface" to be "an output that reports results of the image data comparisons performed by the comparator."**

## V.     CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patent-in-suit.  The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**So ORDERED and SIGNED this 5th day of July, 2012.**

_____

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE