IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| JOHN B. ADRAIN, | Case No. 2:10–cv–173 |
| Plaintiff, | |
| vs. | DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT |
| VIGILANT VIDEO, INC., and THE CITY OF PORT ARTHUR, TEXAS, | |
| Defendants. | |

## I. STATEMENT OF THE ISSUES TO BE DECIDED

First, after the reexamination process concerning Plaintiffs' patent, do all of Plaintiff's identified claims derive exclusively from a "digital" camera and "digital" image data, in the sense that Plaintiff's camera outputs digital data?  **[Yes.]**

Second (and related to the first issue), does Defendant Vigilant Video, Inc.'s purportedly infringing product / process utilize either a "digital" camera or "digital" image data, in the sense that Vigilant's camera outputs digital data?  **[No.]**

Third, does Defendant Vigilant Video, Inc.'s purportedly infringing product / process utilize or incorporate "image data from [a] reference memory"?  **[No.]**

Fourth, given the existence of a reexamined patent dated August 21, 2012, that substantially altered Plaintiff's original patent, does the "intervening rights" doctrine codified in 35 USC § 252 preclude Plaintiff from claiming any "damages" said to arise prior to August 21, 2012?  **[Yes.]**

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     Plaintiff's May 26, 2010, "*Complaint*" (hereafter simply the "Complaint") alleges that

Defendants have infringed and continue to infringe U.S. Patent No. 5,831,669 (hereafter simply "the

Patent" or "Plaintiff's Patent"), issued in November, 1998.  (*Id.* [Docket Number 1], at 2, ¶ 8.)

2.     Plaintiff's original patent contained the following claims numbered 1 through 10:

"**1.**   A monitoring system comprising:

"a movably mounted camera adapted for receiving images of a space to be moni-
tored;

"an interpreter for receiving image data from the camera;

"a reference memory for storing reference image data;

"a comparator connected for comparing image data from the interpreter to image
data from the reference memory according to selected comparison criteria, wherein
the interpreter and comparator cooperate to select recognizable portions of image
data among unrecognized portions of image data in the space being monitored, the
selected image portions being compared to the image data in the reference memory;
and

"an output interface for reporting results of the image data comparisons performed
by the comparator.

"**2.**   A system according to claim 1 further comprising a programmer for inputting
the comparison criteria to the comparator.

"**3.**   A system according to claim 2 wherein the programmer is connected for in-
putting analysis criteria to the interpreter and the interpreter is adapted for analy-
zing the image data according to the analysis criteria.

"**4.**   A system according to claim 3 wherein the programmer is connected for in-
putting learn criteria to the interpreter and the interpreter is connected for storing
image data from the camera in the reference memory according to the learn and
analysis criteria.

"**5.**   A system according to claim 2 wherein the programmer is connected for in-putting learn criteria to the interpreter and the interpreter is connected for storing image data from the camera in the reference memory according to the learn criteria.

"**6.**   A system according to claim 2 wherein the programmer is connected for in-putting utilization criteria, the output interface being adapted for reporting selected comparison results according [to] the utilization criteria.

"**7.**   A system according to claim 1 wherein the camera is mounted on a vehicle.

"**8.**   A system according to claim 1 wherein the record memory is adapted for stor-ing information associated with the image data stored.

"**9.**   A system according to claim 1 wherein the interpreter selects images accord-ing to analysis criteria so that only the selected images are input to the comparator for comparison to reference images.

"**10.**   A system according to claim 9 wherein the selected images represent only portions of a larger image."

(Original Patent, at physical pages 6–7, columns 6 and 7; Declaration of Roy Thompson [hereafter simply the "Thompson Declaration"], Exhibit 1 [copy of original patent] [bold in document itself].)

3.   Plaintiff's Complaint asserts that Defendants infringed, and infringe, the Patent via their use of "image recognition systems and / or devices, including license plate recognition systems and / or devices, . . . such as at least the Vigilant CarDetector system." (*Id.*, at 2 [Docket Number 1], ¶ 10.)

4.   Plaintiff has not amended its 2010 complaint.

5.   Plaintiff's June 3, 2011, *"Disclosure Of Asserted Claims And Infringement Contentions"* (hereafter simply the "Disclosure Statement"), filed pursuant to L.R. 3–1, declares that ". . . Adrain asserts claims 1–3 and 6–10 of [the Patent] against defendants." (*Id.* [Docket Number 53], at 2, § 2.)

6.    Plaintiff's Disclosure Statement further recites that

> "Adrain reserves the right to assert additional claims against defendants based
> upon results of discovery and further investigation."

(*Id.* [Docket Number 53], at 2, § 2.)

7.    Plaintiff has not asserted any "additional claims" against defendants predicated upon the

"results of discovery and further investigation."

8.    Plaintiff's Disclosure Statement further recites that

> "[Defendants'] infringing products, services, and / or systems include at least
> the CarDetector Mobile License Plate Recognition System."

(*Id.* [Docket Number 53], at 2, §§ 3a and 3b.)

9.    Plaintiff has not amended its Disclosure Statement.

10.    On August 21, 2012, the United States Patent & Trademark Office (hereafter simply "the

Patent Office") issued a new patent to Plaintiff after the conclusion of a Patent Office reexamination

proceeding (hereafter simply the "reexamined Patent").   (Thompson Declaration, Exhibit 2.)

The reexamined Patent contains the following claims now pertinent to Plaintiff's claims against

Defendants:

> **"Matter enclosed in heavy brackets [ ] appeared in the patent, but has
> been deleted and is no longer a part of the patent; matter printed in italics in-
> dicates additions made to the patent.**
>
> "AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:
>
> "Claims **1** and **11** are cancelled.
>
> "Claims **2** and **7-9** are determined to be patentable, as amended.
>
> "Claims **3** and **10**, dependent on an amended claim are determined to be patentable.
>
> "New claims **21–52** are added and determined to be patentable.

Page 4 — DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

"Claims **4–6** and **12–20** were not reexamined.

"Other new claims **53–56** were canceled by the Examiner's Amendment.

"**2.**    A system according to claim **[1]** *51* further comprising a programmer for inputting the comparison criteria to the comparator.

"**7.**    A system according to claim **[1]** *51* wherein the camera is mounted on a vehicle.

"**8.**    A system according to claim **[1]** *51* wherein the record memory is adapted for storing information associated with the image data stored.

"**9.**    A system according to claim **[1]** *51* wherein the interpreter selects images according to analysis criteria so that only the selected images are input to the comparator for comparison to reference images.

"\* \* \* \* \*

"*51.    A monitoring system comprising:*

"*a movably mounted digital camera adapted for receiving images of a space to be monitored for directly outputting digital image data:*

"*an interpreter for receiving said digital image data from the digital camera;*

"*a reference memory for storing reference image data;*

"*a comparator connected for comparing image data from the interpreter to image data from the reference memory according to selected comparison criteria, wherein the interpreter and comparator cooperate to select recognizable portions of image data among unrecognized portions of image data in the space being monitored, the selected image portions being compared to the image data in the reference memory; and*

"*an output interface for reporting results of the image data comparisons performed by the comparator.*"

(Reexamined Patent, at physical pages 1 and 3, columns 1 and 4; Thompson Declaration, Exhibit 2 [copy of reexamined patent] [bold and italics as in document itself].)

Page 5 — DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

11.    As it concerns the claims in Plaintiff's Disclosure Statement (*supra*, ¶ 4 [claims 1–3 and 6–10]), the reexamined Patent made the following changes to Plaintiff's original Patent claims:

      a.    Claim 1:   Cancelled

      b.    Claim 2:   Amended

      c.    Claim 3:   Derived from Amended Claim 2

      d.    Claim 6:   <Not reexamined>

      e.    Claim 7:   Amended

      f.    Claim 8:   Amended

      g.    Claim 9:   Amended

      h.    Claim 10:  Derived from Amended Claim 9

(Reexamined Patent, at 1, column 1; Thompson Declaration, Exhibit 2 [copy of reexamined Patent].)

12.    After reexamination, . . .

      a.    former Claim 1 no longer exists

      b.    amended Claims 2, 7, 8, and 9 now each derives from new Claim 51

      c.    Claim 3 now derives from amended Claim 2

      d.    Claim 10 now derives from amended Claim 9

      e.    Claim 6 did not expressly change, but it did impliedly change

(Reexamined Patent, at 1, column 1; Thompson Declaration, Exhibit 2 [copy of reexamined Patent].)

13.    Although the reexamined Patent recites that the Patent Office did not reexamine original Claim 6, Claim 6 still expressly (and necessarily) derives from — or remains dependent upon — Claim 2 by virtue of its own wording, and the reexamination process amended Claim 2 to now speci-

fically reference new Claim 51. (*See* reexamined Patent, at 1, column 1; Thompson Declaration, Exhibit 2 [copy of reexamined Patent].)

14.    Depicted graphically, the original and revised claim relationships appear as follows:

Original Claim Relationship Among Claims 1–3 and 6–10

| Claim 1 | | | |
|---|---|---|---|
| Claim 2 (dependent upon 1) | | Claim 7 (dependent upon 1) | Claim 8 (dependent upon 1) | Claim 9 (dependent upon 1) |
| Claim 3 (dependent upon 2) | Claim 6 (dependent upon 2) | | | Claim 10 (dependent upon 9) |

Revised Claim Relationship
(after reexamination)

| Claim 51 (new) | | | |
|---|---|---|---|
| Claim 2 (amended to reference / dependent upon Claim 51) | | Claim 7 (amended to reference / dependent upon Claim 51) | Claim 8 (amended to reference / dependent upon Claim 51) | Claim 9 (amended to reference / dependent upon Claim 51) |
| Claim 3 (dependent upon amended 2) | Claim 6 (dependent upon amended 2) | | | Claim 10 (dependent upon amended 9) |

(A hierarchical depiction of the facts in ¶¶ 10, 11, 12, and 13, just above; Declaration of Mark Kruse [hereafter simply the "Kruse Declaration"], at 4, ¶ 9.)

15.    Because amended Claims 2, 7, 8, and 9 all expressly derive from — or remain dependent upon — new Claim 51, the reexamination process necessarily supplanted (former) Claim 1 with Claim 51.

16.    New Claim 51 in the reexamined Patent reads — with emphasized text reflecting new text:

"51.  A monitoring system comprising:

"a movably mounted *digital camera* adapted for receiving images of a space to be monitored for directly outputting *digital image data*;

Page 7 — DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

"an interpreter for receiving said ***digital image data*** from the ***digital camera***;

"a reference memory for storing reference image data;

"a comparator connected for comparing image data from the interpreter to image data from the reference memory according to selected comparison criteria, wherein the interpreter and comparator cooperate to select recognizable portions of image data among unrecognized portions of image data in the space being monitored, the selected image portions being compared to the image data in the reference memory; and

"an output interface for reporting results of the image data comparisons performed by the comparator."

(Reexamined Patent, at 2, column 4; Thompson Declaration, Exhibit 2 [copy of reexamined Patent] [emphasis added].)

17.    New Claim 51 relates exclusively to a "digital" camera and "digital" image data (reexamined Patent at 3, column 4), in the sense that Plaintiff's camera system outputs digital data.  The terms "digital camera" and "digital image data" appear twice each.

18.    After reexamination, all of Plaintiff's claims prove derivative of new Claim 51.

19.    The reexamination process has necessarily altered some pertinent claim constructions in the Court's July 5, 2012, *Markman* Order (*see Adrain v. Vigilant Video, Inc.*, 2012 WL 2595287 E.D. Texas 2012):

a.    This Court declared that the word "camera" in Plaintiff's claims shall bear "its plain and ordinary meaning." (*Markman* Order [Docket Number 108], at 7–9.) Claim 51 now utilizes the term "***digital*** camera" (twice). (Reexamined Patent, at 2, column 4 [emphasis added]; Thompson Declaration, Exhibit 2 [copy of reexamined Patent].)

b.    This Court declared that the term "image data" in Plaintiff's claims shall connote "data related to an image." (*Markman* Order [Docket Number 108], at 12–15.) Claim 51 now

utilizes the term "*digital* image data" (twice).  (Reexamined Patent, at 2, column 4 [emphasis added]; Thompson Declaration, Exhibit 2, [copy of reexamined Patent].)

     c.    This Court declared that the term "interpreter" in Plaintiff's claims shall connote "hardware and / or software that receives and selects image data from the camera." (*Markman* Order [Docket Number 108], at 18–20.)  Claim 51 now utilizes the terms "*digital* image data" (twice) and "*digital* camera" (twice).  (Reexamined Patent, at 2, column 4 [emphasis added]; Thompson Declaration, Exhibit 2 [copy of reexamined Patent].)

     d.    This Court declared that the term "comparator" in Plaintiff's claims shall connote "hardware and / or software that compares the image data from the interpreter to the reference image data." (*Markman* Order [Docket Number 108], at 20–21.)  Claim 51 now utilizes the terms "*digital* image data" (twice).  (Reexamined Patent, at 2, column 4 [emphasis added]; Thompson Declaration, Exhibit 2 [copy of reexamined Patent].)

## III.  THIS COURT'S SUMMARY JUDGMENT CRITERIA

### 1.  Summary Judgment Enables The Court To Function As A Gatekeeper

"The purpose of summary judgment [in patent litigation] is to isolate and dispose of *factually unsupported* claims or defenses."

*Williams v. General Surgical Innovations, Inc.*, 2002 WL 32114466, at *1 (E.D. Texas 2002) (emphasis added).

In other words, "the court must make a threshold inquiry in determining whether there is a need for a trial." *Fiber Systems Intern., Inc. v. Applied Optical Systems, Inc.*, 2009 WL 3571350, at *1 (E.D. Texas 2009).

### 2. When Appropriate

The Court ought grant summary judgment when: (1) the pleadings, the evidence on file, and motion–specific affidavits or declarations demonstrate the absence of a "genuine" issue (or dispute) concerning any "material" fact, and, given that absence, (2) the substantive law that underlies the basis for the motion dictates the appropriateness of judgment in favor of the moving party. *Acticon Technologies LLC v. Creative Labs Inc.*, 2012 WL 708059, at *1 (E.D. Texas 2012) (emphasis added); *GTX Corp. v. Kofax Image Products, Inc.*, 571 F.Supp.2d 742, 745 (E.D. Texas 2008).

### 3. Any Purported Fact Dispute Raised By The Non–Moving Part Must Implicate A *"Material"* Fact

Only disputes concerning facts that might directly affect the outcome of the litigation can preclude the entry of summary judgment. *Paid Search Engine Tools, LLC v. Yahoo!, Inc.*, 746 F.Supp.2d 808, 812 (E.D. Texas 2010), *aff'd* 465 Fed.Appx. 953 (Fed.Cir. 2012); *Bright Response, LLC v. Google, Inc.*, 730 F.Supp.2d 610, 615 (E.D. Texas 2010).

### 4. The Law That Underlies The Motion's Essential Thesis Determines "Materiality"

Only the specific substantive law that underlies the summary judgment motion's essential thesis determines which facts rise to the level of "material." *Paid Search Engine Tools, LLC v. Yahoo!, Inc.*, 746 F.Supp.2d 808, 812 (E.D. Texas 2010), *aff'd* 465 Fed.Appx. 953 (Fed.Cir. 2012); *Bright Response, LLC v. Google, Inc.*, 730 F.Supp.2d 610, 615 (E.D. Texas 2010).

### 5.  Arguments That A Fact Dispute Exists Must Implicate A "Genuine" Controversy

The appropriateness of summary judgment separately depends upon the question whether the litigation any longer retains any "genuine" fact dispute, *viz*, whether a reasonable jury could rely upon any identifiable fact in dispute to return a verdict for one party or the other. *Paid Search Engine Tools, LLC v. Yahoo!, Inc.*, 746 F.Supp.2d 808, 812 (E.D. Texas 2010), *aff'd* 465 Fed.Appx. 953 (Fed.Cir. 2012); *Bright Response, LLC v. Google, Inc.*, 730 F.Supp.2d 610, 615 (E.D. Texas 2010). If a hypothetical reasonable jury would not view a particular fact dispute as pertinent to resolution of a contended matter, then the Court cannot label that dispute as implicating any "genuine" factual controversy for purposes of a motion for summary judgment.

Thus, summary judgment remains appropriate when no "reasonable jury could return a verdict for the ***non***moving party" on the basis of a particular fact. *Minton v. National Ass'n of Securities Dealers, Inc.*, 226 F.Supp.2d 845, 857 (E.D. Texas 2002) (citation omitted) (emphasis added), *affd, Minton v. National Ass'n of Securities Dealers, Inc.*, 336 F.3d 1373 (Fed.Cir. 2003). The mere existence of some minor or inconsequential factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Acticon Technologies LLC v. Creative Labs Inc.*, 2012 WL 708059, at *1 (E.D. Texas 2012).

### 6.  Vigilant Shoulders The Initial Burden

Vigilant acknowledges that it, as moving party here, shoulders the initial burden to demonstrate the absence of any "genuine" dispute concerning any "material" fact with respect to the questions for decision framed at the outset of this motion. *Paid Search Engine Tools, LLC v. Yahoo!, Inc.*,

746 F.Supp.2d 808, 812 (E.D. Texas 2010), *aff'd* 465 Fed.Appx. 953 (Fed.Cir. 2012); *Bright Response, LLC v. Google, Inc.*, 730 F.Supp.2d 610, 615 (E.D. Texas 2010).

      7.    **The Non–Moving Party's Burden Encompasses An Affirmative Demonstration That: (1) Some "Material" Fact Precludes Summary Judgment, And (2) Any Dispute About That Fact Proves "Genuine"**

After Vigilant completes its job in this motion of demonstrating the absence of any "genuine" dispute concerning any "material" fact, then the evidentiary burden shifts, and Ioli shoulders the burden to identify the existence of both the existence of some "material" fact and the presence of some "genuine" dispute. *Paid Search Engine Tools, LLC v. Yahoo!, Inc.*, 746 F.Supp.2d 808, 812 (E.D. Texas 2010), *aff'd* 465 Fed.Appx. 953 (Fed.Cir. 2012); *GTX Corp. v. Kofax Image Products, Inc.*, 571 F.Supp.2d 742, 745 (E.D. Texas 2008).

      8.    **In Patent Litigation, The Courts Assess The Meaning Of A Plaintiff's Claims By The Claims' Plain Language**

> "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.' [Citation omitted.]"

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*), *cert. den.*, *AWH Corp. v. Phillips*, 546 U.S. 1170 (2006).

> "We have frequently stated that the words of a claim 'are generally given their ordinary and customary meaning.' [Citations omitted.]"

*Id.*, at 1312.

Thus, for instance the term "digital camera" — which references a camera process that outputs digital data — necessarily excludes cameras that produce, or output, non-digital — *viz.*, analog — data.

The meaning of Plaintiff's reexamined patent claims constitute a question of law for the Court, and thus appropriate for summary judgment considerations. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).

## IV.  ARGUMENT

1.  **After The Patent Reexamination Process, All of Plaintiff's Identified Claims Derive Exclusively From A "Digital" Camera And "Digital" Image Data**

2.  **Defendant Vigilant Video, Inc.'s Purportedly Infringing Product / Process Involves Neither A "Digital" Camera Nor "Digital" Image Data**

Because Plaintiff has amended neither its Complaint nor its Disclosure Statement (Statement Of Undisputed Material Facts, *supra*, ¶¶ 4–9), Plaintiff's claimed infringement stands or falls on the viability of Claims 1–3 and 6–10, as reexamined by the Patent Office.

Summarized at the outset here, Vigilant's camera system cannot contravene Plaintiff's patent claims for the following core reasons:

1.  Vigilant's camera comprises a camera that outputs a purely analog data signal. Plaintiff's system, on the other hand, outputs a digital signal.  (Kruse Declaration, at 3, ¶ 7a.)

2.  Vigilant's system performs no "image–data–to–image–data" comparison within any "space being monitored." Plaintiff's system, on the other hand, does precisely that. (Kruse Declaration, at 3, ¶ 7b.)

3.   Vigilant's system does not compare any camera data to other data generated by the same camera with the aid of any camera–generated, "reference" memory.  Plaintiff's system, on the other hand, does precisely that.  (Kruse Declaration, at 3, ¶ 7c.)

4.   Vigilant's system does not compare "pictures" to "pictures" to assess a pixel–by–pixel match.  Plaintiff's system, on the other hand, does precisely that.  (Kruse Declaration, at 3, ¶ 7d.)

### a.   Plaintiff's Claims Against Vigilant Depend Exclusively Upon A Digital Camera, *viz.*: A Camera That Outputs A Digital Signal

Under Plaintiff's original patent, Claims 2, 7, 8, and 9 each proved derivative of (or dependent upon) Claim 1.  Now, under Plaintiff's reexamined patent, amended Claims 2, 7, 8, and 9 each remains expressly derivative of (or dependent upon) new Claim 51.  *See* Statement Of Undisputed Material Facts, *supra*, ¶¶ 2, 5, 10, 11, 12, 13, 14, and 16; Kruse Declaration, at 3–4, ¶ 8; *see*, as well, Thompson Declaration, Exhibit 3 (Adrain 9 / 27 / 2012 deposition, at 64):

> "Q.  . . .  So is it your understanding that old Claim 1 is now new Claim 51?  Is that your understanding?
>
> "A.   I believe so."

*Id* (with Adrain answering).

Plaintiff has acknowledged that Claims 2, 7, 8, and 9 now represent claims derived from, or directly dependent upon, new Claim 51.  *See* Thompson Declaration, Exhibit 3 (Adrain 9 / 27 / 2012 deposition, at 110–12):

> "Q.  (By Mr. Thompson):   Mr. Adrain, isn't it true that all of the dependent claims that you have asserted that Vigilant Video infringes your '669 patent, that is, Claims 2, 3, 6, 7, 8, 9, and 10 now depend from Claim 51 of the reexamined [']669 patent?

Page 14 — DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

"[Objection to form of question.]

"* * * * *

"Q.  (By Mr. Thompson):  Isn't it true, Mr. Adrain, that all of the dependent claims you have asserted that Vigilant Video infringes of your [']669 patent, that is, Claims 2, 3, 6, 7, 8, 9 and 10 now depend eventually from Claim 51 of the reexamined [']669 patent"

"[Objection to form of question.]

"THE WITNESS: No.

"Q.  Which ones don't?

"A.  Which ones don't what?

"* * * * *

"Q.  Just identify the ones that don't, you answered 'no,' please just tell me *which ones do not depend on new Claim 51*.

[Objection to form of question.]

"THE WITNESS:  So, *the ones that are dependent are 2, 7, 8 and 9*, the other ones aren't."

*Id* (Adrain answering) (emphasis added).

And, in turn, Claims 3, 6, and 10 now derive from (or depend directly upon) amended Claims 2 and 9. (*See* Statement Of Undisputed Material Facts, *supra*, ¶¶ 10, 11, 12, 13, and 14; Kruse Declaration, at 4, ¶ 8.)

35 USC § 112 prescribes that conclusion:

"A claim may be written in independent or, if the nature of the case admits, in dependent or multiple dependent form.

". . . [A] claim in dependent form *shall contain a reference to a claim previously set forth* and then specify a further limitation of the subject matter claimed.

Page 15 — DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

A claim in dependent form *shall be construed to incorporate by reference all the limitations of the claim to which it refers*."

(Emphasis added.)

But Claim 51 now confines Plaintiff's patent to a *digital* process; it incorporates the following descriptors:

"a movably mounted *digital camera* adapted for receiving images of a space to be monitored for directly outputting digital image data,"

and

"an interpreter for receiving said *digital image data* from the *digital camera*."

(Statement Of Undisputed Material Facts, *supra*, ¶ 16 [emphasis added]; Kruse Declaration, at 4, ¶ 10.)

Plaintiff himself acknowledges that, in his own words, for "some of [his] claims the scope has been narrowed slightly," during the reexamination process. *See* Kruse Declaration, at 4, ¶ 10; Thompson Declaration, Exhibit 3, (9 / 27 / 2012 Adrain deposition, at 55).

As the reexamined patent makes plain *vis–a–vis* the original patent, that "narrow[ing]" comprises the reexamined patent's reference to "digital," as that limiter did not previously exist. Kruse Declaration, at 4, ¶ 10. Plaintiff admits the "digital" limitation. *See* Thompson Declaration, Exhibit 3 (9 / 27 / 2012 Adrain deposition, at 66–67, 68–69):

"Q.   (By Mr. Thompson):   Recognizing that [Claim] 51 has the term 'digital' in it, do you believe that to be infringing Claim 51, the camera must be digital?

[Objection as to the form of the question.]

"THE WITNESS:  Perhaps, with that particular claim . . . [.]

"* * * * *

"A.   Well, I see where the claim [*viz.*, Claim 51] has been narrowed to list the 'digital,' which I spoke in my testimony before that the scope was narrowed to digital."

(9 / 27 / 2012 Adrain deposition, at 66–67.)



"Q.   Tell me exactly what's been modified from old Claim 1 to new Claim 51?

"A.   Well, it appears that the word 'digital' has been added.

"* * * * *

"Q.   . . . What's your understanding of the significance of the addition of the word 'digital' in front of the word 'camera'?

"A.   Well, on that particular claim it narrows the scope slightly."

(9 / 27 / 2012 Adrain deposition, at 68–69.)

And, in that vein, Plaintiff admits that "a digital camera outputs digital information" or "data." *See* Thompson Declaration, Exhibit 3 (9 / 27 / 2012 Adrain deposition, at 126).  Plaintiff expressly agrees with "the dictionary meaning" of "digital camera."  *Id.*

### b.   Plaintiff's System Utilizes A Digital Camera That Takes Digital, Pixelated Images, And Outputs Those Images As Digital Data

Plaintiff's system depends upon the utilization of a digital camera in the sense that it outputs a digital signal or data.  It relays — or outputs — digital pixel data to an "interpreter," which, in turn, relays that digital pixel data to a "comparator" that, in turn, performs a pixel–by–pixel digital comparison utilizing stored pixelated digital image data (taken by the same camera) in a reference memory.  Kruse Declaration, at 5, ¶ 11.

### c. Vigilant's System Utilizes An Analog Camera That Outputs Only Analog Data

Vigilant's system, on the other hand, does not output any "digital" product or process like that utilized by Plaintiff. Rather, Vigilant's system utilizes an analog camera, *viz.*, a camera that outputs an analog NTSC signal of the picture taken of a license plate. The camera transmits that analog video signal to a digital signal processor for purposes of producing a distinct binary computer code associated with each image after optical character recognition has been performed. (Kruse Declaration, at 5, ¶ 12.)

Whenever the Vigilant system later conducts a license plate comparison, it compares an ASCII–based character string with another ASCII–based character string that has been input to a remote data base — in other words, a code–to–code comparison devoid of any "image" comparisons. Comparisons occur only between alphanumeric character strings, not "images," because the Vigilant analog system output does not utilize digital "image" elements such as pixels or graphics for comparisons. Rather, Vigilant's OCR process converts pure analog output — video images of a license plate — into an ASCII character string of alphanumeric components, following which the Vigilant system compares the ASCII characters against an external data base of ASCII characters, none of which originate with Vigilant's camera system. (Kruse Declaration, at 5, ¶ 13.)

Furthermore, no "on–board" comparison of data occurs within the Vigilant camera system. Vigilant's system does not compare any captured image data or image elements from the camera to an existing storage of reference image data from the same camera. Stated differently, Vigilant's system does not utilize the digital pixel–by–pixel comparison methodology employed by Plaintiff's system. Instead, it utilizes an external data base — a data base that does not derive from any camera — to compare ASCII codes to ASCII codes. (Kruse Declaration, at 5–6, ¶ 14.)

### 3.   Defendant Vigilant Video, Inc.'s Purportedly Infringing Product / Process Neither Utilizes Nor Incorporates "Image Data from [A] Reference Memory"

Claim 51 — from which all of Plaintiff's existing claims derive — utilizes a "reference memory" component, *viz.*:

> "a *reference memory* for storing reference image data;
>
> "a comparator connected for comparing image data from the interpreter to image data from the *reference memory* according to selected comparison criteria . . . [.]"

(Statement of Undisputed Material Facts, *supra*, ¶ 17 [emphasis added]; Kruse Declaration, at 6, ¶ 16.)

Defendant Vigilant's system, on the other hand, neither utilizes nor incorporates "image data from [a] reference memory." (Kruse Declaration, at 6, ¶ 15.)

In its *Markman* Order, this Court declared the phrase "reference memory" shall connote "data storage that stores data related to an image that is used as a reference for comparison." (*Markman* Order [Docket Number 108], at 16–17.) The recently–completed patent reexamination process did not alter that construction.

### a. Plaintiff's System Employs A "Reference Memory" Of Digital Image Data

Plaintiff's monitoring system stores image data taken from the camera in a (presumably non–volatile) reference memory. The image data goes into the interpretor, and then into the reference memory or to the comparator. Claim 51 renders the presence and utilization of that process both indispensable and incontrovertible. (Kruse Declaration, at 6, ¶ 18.)

Plaintiff's system then utilizes a comparator to utilize and process that same image data. The comparator compares image data from the reference memory to image data from the interpretor, both

Page 19 — DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

of which obtain their image data from the same camera.  Again, Claim 51 renders the presence and

utilization of that process both indispensable and incontrovertible. (Kruse Declaration, at 6–7, ¶ 19.)

Plaintiff's monitoring system generates all of its image data from the camera; it neither utilizes

nor incorporates any imported image data.  Plaintiff's system stores image data in the reference me-

mory that the system later uses as a reference for comparisons with the other image data taken before

the comparison.  Stated differently, Plaintiff's monitoring system compares contemporaneously–ta-

ken image data from the camera to image data previously taken from the same camera.  The compari-

son proceeds pixel by pixel, as that process remains the only way to compare images within Plain-

tiff's system. (Kruse Declaration, at 7, ¶ 20.)

More tersely stated, Plaintiff's system creates, and then utilizes, its own "reference memory"

for comparisons.

### b.   Vigilant's System Does Not Employ A "Reference Memory"; Rather, It Uti-lizes An External Data Base Comprised Entirely Of Non–Digital ASCII Data

Vigilant's system, on the other hand, does not store any reference image data in memory be-

cause it utilizes no image data — *viz.*, pixel–by–pixel — comparisons. (Kruse Declaration, at 7,

¶ 21.)

Rather, Vigilant's system compares data from the camera in a non–image format to data from

an external database — also in non–image format — whose data did not come from that, or any oth-

er, camera.  Any comparisons occur via comparisons of ASCII–character strings only — and ASCII–

character strings do not constitute "image data."  Moreover, the remote database that Vigilant's

system utilizes for comparisons maintains only ASCII–character–string data, not reference "image

data" of any sort. And Vigilant neither creates nor operates that remote database. (Kruse Declaration, at 7, ¶ 22.)

Stated differently, Vigilant's system does not compare image data to image data, but, instead, compares code data (alphanumeric ASCII strings) to code data from an external database. It never compares images via a pixel–to–pixel comparison between data. Quite simply, the Vigilant system simply compares totally different elements. (Kruse Declaration, at 8, ¶ 23.)

### 4.   35 USC § 252 And The "Intervening Rights" Doctrine Precludes Plaintiff From Claiming Any "Damages" For The Period That Preceded The Issuance Of The Reexamed Patent On August 21, 2012

As a result of the reexamination process, 35 USC § 252 and the "intervening rights" doctrine precludes Plaintiff from claiming any damages that purportedly accrued prior to August 21, 2012.

The Patent Office issued Plaintiff's reexamined patent on August 21, 2012, in accordance with 35 USC § 307(a), which declares:

> "(a)   In a reexamination proceeding under this chapter, when the time for appeal has expired or any appeal proceeding has terminated, the Director will issue and publish a certificate **[1]** *canceling* any claim of the patent finally determined to be unpatentable, **[2]** *confirming* any claim of the patent determined to be patentable, and **[3]** *incorporating* in the patent any proposed amended or new claim determined to be patentable."

(*Id.* [emphasis and enumeration added].)

Plaintiff's reexamined Patent includes all three types of reexamined claims — per 35 USC § 307(a) above — pertinent to Plaintiff's original Disclosure Statement, *viz.*: (1) the cancellation of original Claim 1; (2) the confirmation of Claims 3, 6, and 10; and (3) the incorporation of amended Claims 2, 7, 8, and 9.

Page 21 — DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

35 USC § 307(b) separately addresses the question of post–reexamination damages:

> "(b)   Any proposed **amended** or **new claim** determined to be patentable and incorporated into a patent following a reexamination proceeding **will have the same effect as that specified in section 252** of this title for reissued patents on the right of any person who **[1]** **made**, purchased, or used within the United States, or imported into the United States, anything patented by such proposed amended or new claim, or who **[2]** made **substantial preparation for the same**, prior to issuance of a certificate under the provisions of subsection (a) of this section."

(*Id.* [emphasis and enumeration added].)

In turn, the text in 35 USC § 252 — which § 307(b) references — provides two pertinent provisions concerning patent damages:

> "...   **[1]** A reissued patent **shall not abridge or affect the right** of any person or that person's successors in business who, **prior to the grant of a reissue**, made, purchased, offered to sell, or used within the United States, or imported into the United States, anything patented by the reissued patent, to continue the use of, to offer to sell, or to sell to others to be used, offered for sale, or sold, the specific thing so made, purchased, offered for sale, used, or imported **unless** the making, using, offering for sale, or selling of such thing infringes a valid claim of the reissued patent which was in the original patent.

> "**[2]** The **court before which such matter is in question** may provide for the **continued** manufacture, use, offer for sale, or sale of the thing made, purchased, offered for sale, used, or imported as specified, or for the manufacture, use, offer for sale, or sale in the United States **of which substantial preparation was made before the grant of the reissue**, and **the court** may also provide for the **continued** practice of any process patented by the reissue that is practiced, or for the practice of which substantial preparation was made, **before the grant of the reissue**, to the extent and under such terms as the court deems equitable **for the protection of investments made or business commenced before the grant of the reissue**."

(*Id.* [emphasis and enumeration added] [broken into paragraphs for ease of reading].)

35 USC § 252 incorporates the patent law concept of "intervening rights" in the two enumerated sentences. *See Sontag Chain Stores Co. v. Nat'l Nut Co.*, 310 U.S. 281, 293–95 (1940). Per the Federal Circuit Court of Appeals, 35 USC § 252 embodies two related concepts:

"With respect to reissued patents [after reexamination], the concept of intervening rights was codified by the Patent Act of 1952 [Act of July 19, 1952, ch. 950, 66 Stat. 808, now codified as 35 USC § 252], and the statute provides for *two types of intervening rights*: (1) intervening rights that abrogate liability for infringing claims added to or modified from the original patent *if the accused products were made or used before the reissue*, often referred to as *absolute intervening rights*; and (2) *intervening rights that apply as a matter of judicial discretion* to mitigate liability for infringing such claims even as to products made or used *after* the reissue if the accused infringer made substantial preparations for the infringing activities prior to reissue, often referred to as *equitable intervening rights*."

*Marine Polymer Technologies, Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1361–62 (Fed. Cir. 2012) (*en banc*) (emphasis added).

The reference in 35 USC § 252 to "reissued" patents — instead of "reexamined" patents — proves of no moment; 35 USC § 307(b), *supra*, renders § 252 applicable to the reexamination process:

"Although intervening rights originated as a defense against patents modified through reissue procedures, the doctrine has since been extended to the context of patent *reexamination*."

*Marine Polymer*, *supra*, 672 F.3d at 1362 (emphasis added).

As a matter of law, Vigilant possesses the statutory rights described in 35 USC § 252 belonging to one who sold products "prior to the grant of a [reexamined patent]" — or, in the language of the *Marine Polymer Technologies* opinion, above, "absolute intervening rights" for all products made, used, or sold prior to the August 21, 2012, issuance of Plaintiff's reexamined Patent. (It may well possess "equitable intervening rights" as well, but the latter form no issue in this motion for summary judgment.)

Page 23 — DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

Any "intervening rights" analysis depends upon the extent to which a patent reexamination process results in a "substantive" alteration of original patent claims.

> "A patentee of a reexamined patent is entitled to infringement damages, *inter alia*, for the period between the date of issuance of the original claims and the date of issuance of the reexamined claims *if the original and reexamined claims are 'identical.'* [Citations omitted.] Reexamined claims are 'identical' to their original counterparts *if they are 'without substantive change.'* . . . If *substantive changes* have been made to the original claims, the patentee is entitled to infringement damages *only* for the period *following* the issuance of the reexamination certificate. [Citation omitted.]"

*Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1346 (Fed. Cir. 1998) (emphasis added). *See also Tennant Co. v. Hako Minuteman, Inc.*, 878 F.2d 1413, 1417 (Fed. Cir. 1989) ("If [claims in a reexamined patent prove] *not* 'identical' [to claims in the original patent], the patentee has no right to recover infringement damages for periods *prior* to the date that the reexamination certificate issued." [Emphasis added.]), applied in *DuVal Wiedmann, LLC v. InfoRocket.com, Inc.*, 620 F.3d 496, 504 (5th Cir. 2010), to reject claim for license fees said to have accrued prior to reexamination.

The reexamination process in this instance indeed incorporated a "substantive change" to Plaintiff's original patent, specifically, new Claim 51 — upon which all of Plaintiff's now derive — which expressly confines itself to a digital output process. The original patent most certainly did not. Thus, given the substantially–altered nature of Plaintiff's claims as the result of the patent reexamination process, Plaintiff's claim for any damages against Defendants cannot include damages that purportedly arose prior to the reexamination date of August 21, 2012 — at which point Plaintiff's claims became limited to "digital" camera–based claims.

Plaintiff's "reexamined claims" in fact bear a decidedly substantive change, and as a matter of patent law Plaintiff, in the words of the Federal Circuit Court of Appeal in *Laitram Corp.*, *supra*,

"is entitled to infringement damages only for the period *following* the issuance of the reexamination certificate" (*id.*, 163 F.3d at 1346 [emphasis added]) — or after August 21, 2012.

DATED:   November 30, 2012

**THOMPSON BOGRÁN, P.C.**

   /s/ Roy B. Thompson
Roy B. Thompson, *pro hac vice*
15938 SW Quarry Rd., Suite B-6
Lake Oswego, OR 97035
Telephone:      503-245-6600
Facsimile:       503-244-8399
roythompson@comcast.net

**MARK S. HUBERT, PC**
Mark S. Hubert, *pro hac vice*
2300 SW First, Suite 101
Portland, OR 97201
Telephone:      503-234-7711
Facsimile:       503-224-0092
MarkHubert@pacifier.com

Attorneys for Defendant Vigilant Video, Inc.

CERTIFICATE OF SERVICE

The undersigned certifies that he served a copy of this document on counsel of record via

e–mail on November 30, 2012.

**THOMPSON BOGRÁN, P.C.**

/s/ Roy B. Thompson
Roy B. Thompson, *pro hac vice*
15938 SW Quarry Rd., Suite B-6
Lake Oswego, OR 97035
Telephone:      503-245-6600
Facsimile:       503-244-8399
roythompson@comcast.net